WALKENHORST v. KESLER.

No. 5759. Decided May 3, 1937. (67 P. [2d] 654.)

Rehearing Denied September 10, 1937.

314

316

*Dan B. Shields* and *J. Tracy Wootton*, both of Salt Lake City, and *George B. Rinier*, of Davenport, Ind., for appellant.

*L. O. Thomas* and *O. H. Matthews*, both of Salt Lake City, for respondent.

MOFFAT, Justice.

In this action it is alleged by Taylor Walkenhorst in his complaint that the defendant and appellant, A. B. Kesler, is a chiropractor in the state of Utah, licensed to treat human ailments without the use of drugs or medicine and without operative surgery. Relating to the injury for which plaintiff applied to defendant for treatment, it is alleged that while carrying a heavy timber in July, 1933, plaintiff accidentally fell and injured his hip, fractured it and suffered pain and illness because of the injury. Plaintiff claims that for a consideration the defendant undertook to diagnose and analyze plaintiff's injury and illness and to attend, treat, and care for plaintiff, who thereby became a patient of defendant; that under the circumstances it was the duty of defendant to skillfully and carefully diagnose and analyze plaintiff's injury and illness; that defendant negligently and

carelessly failed to carefully, skillfully, and properly diagnose and analyze plaintiff's injury and illness or to prescribe proper treatment, but informed plaintiff that the pain he was suffering in his hip was merely rheumatism which was caused by portions of plaintiff's spinal column being out of alignment, and charges that defendant negligently and carelessly failed to recognize symptoms of infection in plaintiff's hip, but informed him that he had a mere boil on his hip and not to worry. That he would tell him when it was ripe, and that he could stick it with a pin, cut it with a razor blade, or it would break and would pass away on being opened; and, further, that defendant adjusted plaintiff's spine over a period of approximately eight months for rheumatism, an illness from which plaintiff was not suffering; that the negligence and carelessness of defendant in diagnosing and analyzing plaintiff's illness and attending and treating plaintiff proximately caused a condition necessitating plaintiff to undergo an operation for the purpose of having the bones of his hip scraped to eradicate infection therein, which necessitated plaintiff being placed in a cast. Pain, suffering, and anguish are alleged to have been endured because of defendant's negligent treatment of plaintiff.

The defendant demurred to the complaint. The demurrer was not argued to the trial court, nor is it argued to this court. The demurrer being general, although error is assigned because of the overruling of it, under the rules the assigned error is deemed abandoned. Whether abandoned or not, we think the complaint states a cause of action and no error was committed by the trial court in overruling the defendant's demurrer.

Defendant answered. Certain allegations of plaintiff's complaint were admitted, certain other allegations are denied, and in addition the answer contains allegations of traverse and affirmative defense. The answer admits that defendant was and is a licensed and practicing chiropractor in the state of Utah, and a resident thereof; admits the employment and performance of services. The other ad-

missions are interspersed with modifying or qualifying phrases not found in the complaint so that it is difficult to determine just what defendant intends to admit. The answer then denies "each and every allegation of facts therein contained, except such allegations as have been herein expressly admitted." Further denials and defensive allegations are made.

The cause was tried to the court sitting with a jury. A verdict for plaintiff was found by the jury. Motion for a new trial was filed, argued, submitted, and by the court denied. Defendant appeals and assigns numerous errors.

Appellant condenses the assigned errors for argument. They are:

I. "Appellant was at all times herein involved a Chiropractor."

II. "Chiropractic in every particular is entirely separate and distinct from the school of practice of expert witnesses produced by the Respondent."

III. "The question of the negligence of the Practitioner of one school of healing in malpractice actions must be tested by the general principles and practice of that particular school."

IV. "All of the expert witnesses testifying for the Respondent as to the care and skill of the Appellant, were concededly members of a school of healing separate and distinct from Chiropractic."

V. "Testimony of expert witnesses for the Respondent, all of whom disclaimed any knowledge of Chiropractic and who acknowledged specifically that the school of practice represented by themselves was entirely separate and distinct from Chiropractic, was not admissible upon the question of care and skill exercised by the Appellant Chiropractor."

VI. "The rule in malpractice actions which confined the injury as to skill and care of Practitioner to the school of healing of the Practitioner, applies as well to diagnosis as to treatment."

VII. "A mistake in diagnosis (and the Chiropractic counterpart, palpation or analysis) is not of itself sufficient to establish negligence."

VIII. "If the Respondent was entitled to any damages, the damages awarded by the Jury were clearly excessive."

IX. "A Chiropractor, or any Practitioner of a healing art, in a malpractice action, is liable, if at all, only for such damages as are sustained solely through the alleged negligence of the Practitioner, and the Practitioner cannot be held answerable for any inconvenience, pain, suffering and other damage which resulted proximately from the initial injury."

X. "The negligence of the Defendant in a malpractice case must be shown affirmatively. It is not sufficient that there be a possibility of negligence."

XI. "The mere failure to effect a cure does not raise a presumption of a want of proper care, skill and negligence" (apparently means diligence).

XII. "Where, under the testimony, the cause of an injury is conjectural merely, the case should not go to the jury."

XIII. 'The verdict of the Jury was the result of passion and prejudice against Appellant and not sustained by the evidence."

XIV. "Damages to be recoverable at law, must be certain and not speculative in character."

XV. "The Trial Court erred in giving to the Jury over the objection of Appellant instructions numbered 5, 6, 7, 8, 10 and 11."

XVI. "The Court committed error in refusing to give Defendant's instructions numbered 1, 2, 5, 7, and 9."

XVII. "The demurrer of Appellant to the complaint of Respondent should have been sustained."

XVIII. "The Motion of Appellant for a Nonsuit should have been sustained."

XIX. "The Motion of Appellant for Directed Verdict should have been sustained."

XX. "The Motion of Appellant for a New Trial should have been sustained."

Defendant concedes some of these propositions and controverts others. We shall discuss the controverted questions. statements numbered I, IV, IX, X, XI, and XIV are agreed to by respondent. Propositions VIII and XIII claim the damages awarded were excessive. There is nothing in the record from which this court can conclude there was any bias, passion, or prejudice existing on the part of the court or the jury. The amount itself is not sufficient to show such matter. Looking at the record as a whole,

we cannot say the verdict was excessive. *Miller* v. *Southern Pacific Co.,* 82 Utah 46, 21 P. (2d) 865. Nothing more need be said as to the errors claimed relating to damages.

Propositions XVII, XVIII, XIX, and XX relate, respectively, to the overruling of defendant's demurrer, denial of the motion for nonsuit, denial of the motion for a directed verdict, and the denial of the motion for a new trial. None of these assignments are argued. They are without merit. The complaint states a cause of action; the evidence is in conflict; the cause was properly submitted to the jury.

Proposition II is:

"Chiropractic in every particular is entirely separate and distinct from the school of practice of expert witnesses produced by the Respondent."

Propositions III, IV, V, and VI are sufficiently on common ground to be discussed with Proposition II. Proposition I, in so far as it relates to what is meant by "Chiropractor" or "Chiropractic," is also sufficiently on common ground to be included. A "school" of medicine, science, chiropractic, or naturopathy, in the sense of an institution in which one obtains a training by pursuing a given curriculum, is one proposition. "School" is used in many senses; (a) An institution of learning; (b) the doctrine, tenets, philosophy or theories taught or principles for which the school stands; (c) the standards, doctrines, or principles relating to a profession or occupation in a given locality. For other and extended definitions see Webster's New Int. Dict. (2d Ed.) p. 2336. The standards or theories relating to the pathology, etiology or treatment of human ailments, is another. Accumulation of data from symptoms, examinations, history of ailments, and analyzing or diagnosing or determining the nature of the ailment, is another. Prescribing for, adjusting, or treating a patient for an ailment diagnosed to be the one from which the patient is thought to be suffering, in the judgment of the person consulted based upon the analysis

or diagnosis, is still another. Could we determine just what a "chiropractor" is the issues in this case would be simplified. Defendant alleges that he did render services to plaintiff. In the case of *Board of Medical Examiners of State of Utah* v. *Freenor*, 47 Utah 430, 154 P. 941, 942, Ann. Cas. 1917E, 1156, quoting other authorities, the court said chiropractic is:

"A system of therapeutic treatment for various diseases, through the adjusting of articulations of the human body, particularly those of the spine, with the object of relieving pressure or tension upon nerve filaments. The operations are performed with the hands, no drugs being administered." Nelson's Ency.

"A system of manipulations which aims to cure disease by the mechanical restoration of displaced or subluxated bones, especially the vertebrae, to their normal relation. It is claimed that slight displacements of the spinal segments are frequent, that they constrict important nerves and arteries, and that chiropractic adjustment corrects the displacement and relieves the pressure." International Ency.

"A system, or practice, of adjusting the joints, especially of the spine, by hand for the curing of disease." Webster's New International Dictionary (2d Ed.) p. 470.

"Chiropractic" as defined by the statute is somewhat more restricted than the above definitions. R. S. Utah 1933, 79-1-5 (5) quoted infra.

Defendant's answer refers to "Chiropractic," "Chiropractic Science," "Chiropractic Services," "Customary services rendered by a Chiropractor in the Practice of the Science of Chiropractic," "Chiropractic means," "Chiropractic is a separate and distinct School of Healing," "Chiropractic has its own rules of Practice concerning principles of disease," "Chiropractic is a Science practiced without the use of drugs or medicine and without operative surgery," "a Chiropractor and Practitioner of said School and/or Science of Chiropractic; that said Science is a different and distinct School of Healing from that of medicine and surgery and has rules and principles and manner of service different and distinct, which each Practitioner observes in a given case." Etymologically chiropractic means "effective hands."

The testimony on the part of defendant indicates that chiropractic is a theory of determining, treating, and healing human ailments. Defendant in his testimony said:

"The theory of chiropractic, with respect to disease is that the mind operates the body; it is in control of all of the organs; it tells the feet and legs and muscles of the body to obey the mind. That is true of the internal organs. The mind tells the heart to beat and when to beat; it tells the three thousand different organs and glands in the body how to do their work and they obey it. It does that work through the nervous system. The mind is in the brain and communication is by way of the nerves, which come down into the spine; the mind tells the spine to do its work. If you sever a nerve that leads to the heart, it will quit functioning right now; the same thing will happen to the stomach; if you sever the communication between the brain and the stomach, it wouldn't function any longer. If you should sever all the nerves that lead to all parts of the body, the whole thing would cease to function. Now you know from this when a man gets his back broken at this point, what happens to the lower part of the body? When the spine is broken, the cord is severed, there is no functioning there. If through a complete severance of the nerve you cause a complete paralysis of the body, through a severe squeezing of the nerve you diminish the function of that organ, or through the strains and bumps of life you get the spine slightly misplaced, it causes a squeezing and pressing on the nerves, then it causes an interference of what is commonly known by the medical profession as a diseased condition in the organs. That is the theory of chiropractic;" and "The chiropractic system of diagnosis differs entirely from medical diagnosis. The medical man looks for a condition, the chiropractor looks for a cause of the condition."

Clarence B. Johnson, a witness for defendant, testified:

"Chiropractic can expect to build back bone after it has been partly disintegrated."

Arthur W. Olson, a witness for defendant, testified:

"Chiropractic is a drugless therapy. The chiropractic theory does not include the prescribing of diet."

Orson E. Kesler, a witness for defendant, testified:

"According to the theory of chiropractic pressure on the nerves is the cause of all difficulty."

The law of Utah does not provide for the licensing of "chiropractors" as such. The statutory definition to the effect that "chiropractic is defined as the science of palpating and adjusting the articulation of the spinal column by the hands only" (R. S. Utah 1933, 79-1-5 (5), finds no counterpart in the licensing section, or in the section preceding the prescribed qualifications for or examination to determine fitness to treat human ailments. This will appear from a further examination of other provisions of the statute. Five classes of licenses are provided by the chapter of the statute relating to the practice of medicine and surgery and the treatment of human ailments. They are:

"(1) To practice medicine and surgery in all branches thereof.

"(2) (a) To practice as an osteopathic physician without operative surgery in accordance with the tenets of a professional school of osteopathy recognized by the department of registration. (b) To practice as an osteopathic physician and surgeon in accordance with the tenets of a professional school of osteopathy recognized by the department of registration.

"(3) To practice the treatment of human ailments without the use of drugs or medicine and without operative surgery in accordance with the tenets of the professional school, college or institution of which the applicant is a graduate as designated in his application for license; if the applicant for a license under subsection (2) or under this subsection successfully passes the examination in obstetrics the license shall also set forth his right to practice obstetrics.

"(4) To practice obstetrics." R. S. Utah 1933, 79-9-3.

The foregoing provisions of the statute are clear. There is no occasion to misunderstand or misapply them.

Any such licenses when granted must be recorded in the office of the recorder of the county in which the licensee resides.

In order to qualify for the respective licenses, certain scholastic or educational attainments, requirements, and training standards must be met by those applying for a license of any particular class designated in the application to the department of registration. These educational requirements are:

"For the practice of medicine and surgery in all branches thereof minimum standards of preliminary and professional education are fixed as follows:

"(1) An applicant who is a graduate prior to March 14, 1907, must be a graduate of a legally chartered medical college in good standing at the time of his graduation.

"(2) An applicant who is a graduate subsequent to March 13, 1907, and prior to May 9, 1911, must be a graduate of a legally chartered medical college in good standing at the time of his graduation which required for graduation a minimum of 2,286 class hours in lectures and class work in the subjects required in said college as a prerequisite to graduation; and in addition thereto must be a graduate of a high school of first grade or have educational attainments equivalent thereto.

"(3) An applicant who is a graduate subsequent to May 8, 1911, and prior to May 8, 1921 must be a graduate of a medical college in good standing at the time of his graduation which required for graduation a minimum of 3,500 class hours in lectures and class work in the subjects required in said college as a prerequisite to graduation; and in addition thereto must be a graduate of a high school or other equivalent school requiring an attendance through four school years, being equal to fifteen units, and, if graduated subsequent to January 1, 1917, must have had one year of college work prior to entering a medical college.

"(4) An applicant who is a graduate subsequent to May 7, 1921, and prior to July 1, 1926, must be a graduate of a medical college reputable and in good standing at the time of his graduation which required as a prerequisite to graduation a four years' residence course of instruction over a period of four school years of not less than eight and one-half months of actual school attendance and study in each of such school years; such course to include not less than 3,500 class hours in lectures and class work; and in addition thereto the applicant must

be a graduate of a high school or other equivalent school requiring an attendance through four school years, being equal to fifteen units, and have had one year of college work prior to entering a medical college.

"(5) An applicant who is a graduate subsequent to June 30, 1926, must be a graduate of a medical college in good standing at the time of his graduation which required of its students as a prerequisite to admission to such medical college that they should be graduates of a high school or other equivalent school that required an attendance through four school years, being equal to fifteen units, and that they should have had two years in a college of liberal arts; furthermore that such medical college also required as a prerequisite to graduation at least a four years' residence course of instruction over a period of four school years of not less than eight and one-half months of actual school attendance and study in each of such school years; and in addition thereto the applicant must have had a course of training of not less than twelve months in a hospital approved by the department of registration." R. S. 1933, 79-9-5.

"An applicant desiring to practice as an osteopathic physician only, without recourse to operative surgery in any of its branches, must have satisfactorily completed an approved course of study in a high school or other equivalent school having a course of study requiring an attendance through four school years; and in addition thereto the applicant shall be a graduate of a professional school or college of osteopathy, legally chartered, which required as a prerequisite to graduation the completion of at least 4,422 hours of class work covering the standard American Osteopathic Association curriculum and gave instruction in all of the subjects necessary to educate a thoroughly competent general practitioner." R. S. 1933, 79-9-6.

"An applicant desiring to practice as an osteopathic physician and surgeon must be a graduate of an osteopathic college reputable and in good standing at the time of his graduation, requiring as a prerequisite to graduation a four years' residence course of instruction over a period of four school years of not less than eight and one-half months of actual school attendance and study in each of such school years; such course to include not less than 4,422 hours in lectures and class work equal to the standard required of other practitioners of surgery; and in addition thereto the applicant must be a graduate of a high school or other equivalent school requiring an attendance through four school years being equal to fifteen units, must have had one year of college work in a recognized university or college, and must have completed a one year course of training as a surgical interne in a hospital equipped for doing major surgical work." R. S. 1933, 79-9-7.

"For the practice of any other system of treating human ailments without the use of drugs or medicine and without the use of operative surgery the minimum standard of professional education shall be fixed as follows:

"(1) An applicant who is a graduate prior to March 14, 1907 must be a graduate of a legally chartered professional school, college or institution teaching the system of treating human ailments for which the applicant desires to be licensed, in good standing at the time of his graduation.

"(2) An applicant who is a graduate subsequent to March 14, 1907 and prior to May 9, 1923 must be a graduate of a legally chartered professional school, college or institution teaching the system of treating human ailments for which the applicant desires to be licensed, in good standing at the time of his graduation, which required a minimum of 2,286 class hours in lectures and class work in the subjects required in such professional school, college or institution as a prerequisite to graduation; and in addition thereto he must be a graduate of a high school of the first grade or have educational attainments equivalent thereto.

"(3) An applicant who is a graduate subsequent to May 8, 1923, and prior to July 1, 1926, must be a graduate of a professional school, college or institution teaching the system of treating human ailments for which the applicant desires to be licensed, in good standing at the time of his graduation, which required a minimum of 3,500 class hours in lecture and class work in the subjects required in such school as a prerequisite to graduation; and in addition thereto he must be a graduate of a high school or other equivalent school requiring an attendance through four school years, being equal to fifteen units, and must have completed one year of college work prior to entering the professional school, college or institution.

"(4) An applicant who is a graduate subsequent to June 30, 1926 must be a graduate of a professional school, college or institution teaching the system of treating human ailments for which the applicant desires to be licensed, in good standing at the time of his graduation, which required as a prerequisite to graduation at least 4,000 class hours in lectures and class work in the subjects required in such school; and in addition thereto he must be a graduate from a high school requiring an attendance through four school years, being equal to fifteen units, and have completed one year of college work in a college of liberal arts approved by the department." R. S. 1933, 79-9-8.

In addition to the educational and other requirements provided by the quoted sections the statute provides for the payment of a fee for examinations:

(1) "For an examination in medicine or in any other system of treating human ailments, $25."

(2) "For an examination in obstetrics, $15."

There is then provided, in addition to the educational requirements, the submission by each applicant; the scope of the subject matter to be covered in the examination the applicant must pass to practice medicine in all its branches; the scope or subject matter of the examination to practice osteopathy; and the scope or subject matter of the examination to practice the treatment of human ailments without drugs or surgery, and the requirements for the practice of obstetrics.

Protecting the health of the people against the consequences of ignorance, charlatans, fakers, and imposters is a matter of importance to the state, and under its police power it may exact in many pursuits the standard of attainment by those who would engage in those pursuits, especially those requiring skill, learning, and training. *People* v. *Love*, 298 Ill. 304, 131 N. E. 809, 16 A. L. R. 703.

"The examination of those who desire to practice medicine and surgery in all branches thereof shall cover those general subjects and topics, a knowledge of which is commonly and generally required of candidates for the degree of doctor of medicine by reputable medical colleges in the United States." R. S. 1933, 79-9-12.

"The examination of those who desire to practice *systems of treating human ailments without the use of drugs or medicines and without operative surgery shall be of the same character as that required of those who desire to practice medicine and surgery in all branches thereof, excepting therefrom materia medica, therapeutics, surgery obstetrics and theory and practice.* [Italics added.] If the applicant is a graduate of a professional school, college or institution in which the subject of obstetrics as taught therein is deemed equal to that taught in a medical college reputable and in good standing, he may on his request be examined in the subject of obstetrics. In the subject of theory and practice the applicant shall be examined in ac-

cordance with the theory and practice taught by the professional school, college or institution of which the applicant is a graduate." R. S. 1933, 79-9-13.

"Any person licensed to practice in any school or system of treating human ailments without the use of drugs or medicines and without operative surgery may take an examination to practice medicine and surgery in all branches thereof upon proof of having successfully completed a course of study such as is required for admission to an examination for a license to practice medicine and surgery in all branches thereof. In such case the applicant shall take an examination in therapeutics, materia medica, theory and practice, surgery and obstetrics only. If the applicant successfully passes such examination, a license to practice medicine and surgery in all branches thereof may be issued." R. S. 1933, 79-9-14.

"Nothing herein shall be construed to deny to those persons licensed to practice any system of treating human ailments the right to use such antiseptic precautions as may be prescribed by the state board of health for the prevention of the spread of communicable diseases or the right to use antidotes in case of emergency involving poisoning." R. S. 1933, 79-9-19.

The requirements for a license to practice medicine in all its branches includes all the requirements for the treatment of human ailments in any of the other classes referred to by the statute. The only distinguishing subject matter for other licensees to treat human ailments without the use of drugs or medicine or operative surgery required to be covered by the examination is "theory and practice." Thus, one who under the statute has a license for and holds himself out as a chiropractor holds himself out as one qualified to treat human ailments with all the qualifications of one holding a license to practice medicine in all its branches, "excepting therefrom materia medica, therapeutics, surgery, obstetrics and theory and practice." The provisions of section 79-9-14 emphasize this analysis and determine the position various licensees occupy legally, scholastically, and professionally. Could it be said as it was in the case of *People* v. *Love*, 298 Ill. 304, 131 N. E. 809, 811, 16 A. L. R. 703, that: "The statute now in question recognizes such science [chiropractic] as a useful and legal

method of treating human ailments, and prescribes what are deemed the necessary professional education and other qualifications to practice such method of healing," this case might not have been here, and if it were, the solution would have been easier? A person consulting a chiropractor, if such licensee adopting such characterization holds himself out as one capable of treating human ailments assumes the duties and responsibilities thereof the same as any other class of licensees under the statute who do likewise, is entitled to rely upon the scope of the qualifications of such licensed practitioner under the statute—whether a practitioner of medicine and surgery in all branches, an osteopathic physician, osteopathic physician and surgeon, a practitioner for the treatment of human ailments without the use of drugs and medicines, whether designated chiropractor, naturopathist, or whatever particularization accurately covers the scope of the requirements as to educational attainments, training, and professional standing required by the statute.

No school known as the chiropractor school is recognized by the statute of Utah. Chiropractic is defined as *"the science of palpating and adjusting the articulation of the spinal column by the hands only"*. (Italics added.) Another definition will be found in *People* v. *Love,* supra. Two are quoted from other sources in *Board of Medical Examiners* v. *Freenor,* 47 Utah 430, 154 P. 941, Ann. Cas. 1917E, 1156, and Webster's Dictionary is referred to. An examination or exploration of the spine by touch or feeling the spine with the hands is regarded as synonymous with palpation.

The evidence discloses that the newer method of analysis or diagnosis or investigation of the subluxation or incomplete dislocation of the segments of the spine is now determined, not by palpation, but by the use of an instrument known as a "neurocalometer" or "neurocalorimeter," which the testimony of William W. Seare, a witness for defendant, discloses is more scientific than palpation. The instrument

appears to be one which is designed, judging from the etymology of the term, and witnesses' explanations, to disclose the differences of nerve temperature of the parts of the spinal column as the instrument is moved over the segments of the back—increase of nerve temperature indicating a subluxation, the remedy for which is an adjustment to reduce the incomplete dislocation of the affected segments of vertebrae. Under the statutory definition "chiropractic is defined as the science of palpating and adjusting the articulation of the spinal column by the hands only." This definition limits the activities of the "chiropractor" to treatment only—to feeling and adjusting the spine. In the absence of a human ailment or the treatment thereof why require a license? If a patient made no suggestion as to an ailment but merely asked for a palpation of his spine, no diagnosis is involved.

Respondent concedes that appellant is a chiropractor and does not belong to the allopathic school. The statute does not provide for a license on that classification.

Respondent rests his case upon the ground that appellant diagnosed the defendant's ailment and that the diagnosis was negligent and faulty. That the treatment, even if it were conceded the palpation or adjustment might in some way tend to relieve or ameliorate the ailment of plaintiff, was negligent and injurious to plaintiff. That the advice and directions given by appellant to respondent were not suited to respondent's case and were injurious.

Appellant contends that the only evidence that may be considered as to malpractice in the case must be produced by a practitioner of the chiropractic school. An examination of the statute and the cases indicate that no rule as to the matter has as yet been laid down in this state. Where the classification has been made into allopathic schools, homeopathic schools, osteopathic schools, chiropractic schools, or other classifications of schools, there is ample authority to support the contention that the professional conduct and treatment of a physician of one particular school when

called in question in a court of justice should be tested by the rules of treatment of his school and not by those of other schools. The cases indicate that duly licensed practitioners, physicians, and surgeons, or other administering treatment for a consideration, are bound to exercise such reasonable care and skill as is ordinarily possessed and exercised by practitioners, physicians, and surgeons, or others in good standing of the same system or school of practice or treatment in the locality and community of his practice, having regard to the advanced state of the school or science of treatment at the time. That when a patient selects any one of the many schools of medical treatment or healing to serve him, he thereby accepts and adopts the kind of treatment common to that school. That such is the law in jurisdictions where such classifications have been made by statute, or by the decided cases, or where no statutory classifications have been made, there is ample authority.

The question of the competency of a witness to testify as an expert is one for the court. Some of the cases say exclusively for the court, as the evidence as to his competency is addressed to the court. *Martin* v. *Courtney*, 75 Minn. 255, 77 N. W. 813, 814. The case of *Berkholz* v. *Benepe*, 153 Minn. 335, 190 N. W. 800, 801, was one against a physician and surgeon for malpractice. The Minnesota cases are there collected and, among other things, it is stated:

"We have no statute limiting medical experts to persons licensed to practice in the state. In the absence of such a statute it would seem clear that a graduate from any reputable school of medicine and surgery might qualify as an expert."

To analyze and comment on, classify or distinguish the cases cited by the parties to this cause would be without profit and would unduly lengthen this opinion.

Under the Utah statute, the Legislature intended that a license to practice medicine and surgery in all its branches (section 79-9-3, supra) should cover the whole field of treat-

ment of human ailments. We see no escape from this construction. An osteopathic physician desiring to practice as an osteopathic physician only, without operative surgery, must have had "instruction in all of the subjects necessary to educate a thoroughly competent general practitioner." Section 79-9-6, supra. This creates a subclass of practitioners under the classification and with fewer requirements than the general practitioner. The requirements for an osteopathic surgeon are similar, with some additional requirements, including a "one year course of training as a surgical interne in a hospital equipped for doing major surgical work." Section 79-9-7, supra.

Educational requirements are required "for the practice of any other system of treating human ailments without the use of drugs or medicine and without the use of operative surgery." Section 79-9-8, supra. This is still a class of practitioners for the treatment of human ailments with fewer requirements than the general practitioner. This section, as well as the section relating to the scope of practice of treating human ailments without drugs or medicine or operative surgery, includes not only chiropractors but all others seeking licenses for practicing the treatment of human ailments without drugs or medicine or operative surgery. The statutes are clear.

"The examination of those who desire to practice medicine and surgery in all branches thereof shall cover those general subjects and topics, a knowledge of which is commonly and generally required of candidates for the degree of doctor of medicine by reputable medical colleges in the United States." Section 79-9-12.

"The examination of those who desire to practice systems of treating human ailments without the use of drugs or medicines and without operative surgery shall be of the same character as that required of those who desire to practice medicine and surgery in all branches thereof, excepting therefrom materia medica, therapeutics, surgery, obstetrics and theory and practice. If the applicant is a graduate of a professional school, college or institution in which the subject of obstetrics as taught therein is deemed equal to that taught in a medical college reputable and in good standing, he may on his

request be examined in the subject of obstetrics. In the subject of theory and practice the applicant shall be examined in accordance with the theory and practice taught by the professional school, college or institution of which the applicant is a graduate." Section 79-9-13.

The general practitioner is by the statute required to cover the field. Those desiring to practice the treatment of human ailments without the use of drugs or medicine or operative surgery must likewise cover the field with the exception of "materia medica, therapeutics, surgery, obstetrics and theory and practice." Under the Utah statute a practitioner licensed to practice medicine is, if the trial court finds from the evidence that he is such practitioner, possessing the qualifications required of a practitioner of medicine in all its branches, qualified to testify as an expert in a malpractice case charging negligence in diagnosing or negligent treatment of human ailments.

Respondent charges in his complaint and in argument that appellant did in fact diagnose and advise as to respondent's ailments and treated for such ailments. The record discloses that appellant took from 30 to 35 urinalyses of respondent during the period he was a patient; that appellant told respondent the vertebrae of his spine were out of alignment; that they were pinching a nerve that was leading down and causing the pain; that his spine was twisted out and that he had dislocated his hip or "it was out of place somehow"; a lump or swelling appearing on respondent's hip and appellant informed him that the lump was a mere boil and he should not worry about it because appellant would inform him when it was ripe and ready and then respondent could prick it with a pin or take a razor blade and cut it, or it would break while he was lying on it in bed; that respondent asked appellant if he did not think his ailment was something more than a boil, as he was afraid it might be a cancer; that appellant told him it was not; that he was too young for a cancer. That defendant manipulated plaintiff's left leg at the hip and pushed and pulled at it every

day for three weeks except Sundays. The foregoing is only a brief reference to some of the testimony of respondent. That appellant denied some of it is true. Appellant, however, admitted that he makes urinalyses of his patients to get a general run of the condition of their kidneys; that he takes temperature for fever and takes blood pressure.

If he had taken the examinations and met the requirements of the statute covering the requirements to treat human ailments without the use of drugs or surgery and had a license so to do he might properly do so without classification as to school or other than being licensed to treat human ailments within the purview of his license.

But under the statute, the words "chiropractic," "analysis," "adjustment," and "subluxation," may not be used to conjure with in attempts to circumscribe or limit a field of treatment of human ailments to palpation or feeling of the human spine and adjustment of the segments thereof and thus escape the responsibility incident to the negligent treatment of "human ailments." The statute of Utah has been amended since the case of *Board of Medical Examiners of Utah* v. *Freenor* (1916) 47 Utah 430, 154 P. 941, 947, Ann. Cas. 1917E, 1156, and also since the decision in the case of *Board of Medical Examiners of Utah* v. *Blair* (1921) 57 Utah 516, 196 P. 221. The purpose is essentially the same. "The state has the right, and it is its duty, to protect the public." No matter what the belief of the doctor of the patient is in any theory of the cause of human ailments or the treatment thereof, they must submit to the law. In the Freenor Case there is a discussion appropriate here. Referring to an Illinois statute relating to practice of medicine, the court said:

"There it was held that one practicing osteopathy was practicing medicine within the meaning of that statute declaring that 'any person shall be regarded as practicing medicine who shall treat, operate on, or prescribe for, any physical ailment of another.' *Jones* v. *People*, 84 Ill. App. 453. Similar rulings were made under stat-

utes not as broad as ours (*Bragg* v. *State*, 134 Ala. 165, 32 So. 767, 58 L. R. A. 925; *Little* v. *State*, 60 Neb. 749, 84 N. W. 248, 51 L. R. A. 717; *State* v. *Gravett*, 65 Ohio St. 289, 62 N. E. 325, 55 L. R. A. 791, 87 Am. St. Rep. 605), likewise that chiropractic is practicing medicine (*State* v. *Johnson*, 84 Kan. 411, 114 P. 390, 41 L. R. A. (N. S.) 539; *State* v. *Miller*, 146 Iowa 521, 124 N. W. 167; *State* v. *Smith*, 233 Mo. 242, 135 S. W. 465, 33 L. R. A. (N. S.) 179); so a magnetic healer who treated a lame ankle by rubbing the affected parts (*Parks* v. *State*, 159 Ind. 211, 64 N. E. 862, 59 L. R. A. 190; *People* v. *Gordon*, 194 Ill. 560, 62 N. E. 858, 88 Am. St. Rep. 165; *Smith* v. *People*, 51 Colo. 270, 117 P. 612, 36 L. R. A. (N. S.) 158), and one who professed to cure disease by suggestive therapeutics and laying on of hands (*Witty* v. *State*, 173 Ind. 404, 90 N. E. 627, 25 L. R. A. (N. S.) 1297). And it may be stated that, under statutes similar to ours, it has been quite generally held that what the defendant did was practicing medicine within the meaning of the statute. Perhaps an exception to this is the case of *Nelson* v. *Board of Health*, 108 Ky. 769, 57 S. W. 501, 50 L. R. A. 383. Under the evidence we think it indisputably shown that the defendant diagnosed, treated, and operated upon physical ailments and abnormal and physical conditions of others for a fee, and that he held himself out to treat such ailments and conditions. True, he testified that he made no diagnosis; but he cannot exculpate himself by his own definition of that term, 'trying to name something; give it some tangible name' —a definition which has neither judicial nor scientific sanction. It is at war with definitions of lexicographers: Webster and Standard, 'The art or act of recognizing the presence of disease from its signs or symptoms and deciding as to its character;' International Ency., 'The determination of the nature of a disease as well as of a condition of the organ or tissues affected'—and manifestly is not the sense in which the term is used in the statute, nor in which it is either popularly or technically understood. The defendant's statements that he did not 'diagnose any disease' or 'the patient,' that 'he had nothing to do with the diseased part,' and that all he did was 'to look at the spine and vertebrae—analyze the spine—to ascertain whether there was any displacement or subluxation or any other abnormal condition of the vertebrae,' and 'whether there was pressure or an impingement of the nerves, or an interference with vital energy of force, or a hindrance of the normal flow of life energy producing the disease,' and 'to examine the spine to find what is the cause of their ailment,' are mere evasions and confusions of what, in fact, is diagnosis to ascertain the cause of the disease or ailment. So are his statements, 'I don't treat the sick or ailing; I merely adjust their spine; I make a distinction between adjustment and treat-

ment;' that he 'did not treat goiter, but merely manipulated the vertebrae to remove the impingement which caused it'; nor consumption, but merely 'made an adjustment of the vertebrae for that'; nor the eye, simply 'adjusted the vertebrae of the neck for that'; nor tonsilitis, or diphtheria, 'merely made the vertebrae normal so that the nerve would supply the necessary energy to protect the tissues that are being attacked by these germs.' Doing these things the defendant does not call 'treating a disease or ailment,' merely 'an adjustment to remove the cause of the ailment,' and thus again, by his own and unwarranted definition, seeks to exculpate himself. As well say that a regular physician did not treat an ailment by giving or advising something to remove the cause producing the ailment. To ascertain and remove the cause of an ailment is one of the essentials sought by every efficacious system of treatment. It is difficult to understand how removing, or attempting to remove, the cause of an ailment is not treating, or attempting to treat, the ailment itself. Whatever merits or demerits the system of chiropractic may have, it is but egotism to assert that it is the only system which seeks to ascertain and remove causes of disease or ailments, and on that ground to claim it distinguishable from all other systems of treatment.

"The law is not concerned with the question of whether chiropractic is as good as or better than other systems of treatment. It is concerned with the question that before any one shall undertake, no matter by what system, to diagnose, treat, operate upon, or prescribe or advise for any physical or mental ailment or condition of another for a fee or other consideration, he shall possess the learning and skill required by the statute and produce a degree or diploma from a college meeting the requirements enumerated in the statute, and successfully pass an examination before the board showing his competency. When he does that, then he can practice whatever system he may consider the most efficacious, or do that in a given case which he thinks will produce the best result."

The purpose of the law is to protect public health, maintain proper standards. It is not the purpose of the law to create or foster monopolistic protection for any group, or classification of practitioners in any field of licensed practice.

Appellant argues that, because the physicians who testified on behalf of plaintiff admitted that they had not studied "chiropractic" and either had no knowledge or only a super-

ficial knowledge thereof, their testimony should all have been stricken and that the only evidence admissible is that of the witnesses produced by defendant who are of the "chiropractic school"—the school to which defendant claims to belong and by which he alone must be bound. The cases are numerous that support appellant's position. Were we bound by the weight of authority of the decided cases on this question, free from statutory requirements, we would accept appellant's position.

From the statutory references and cases cited, it is apparent however appellant's position is untenable under the law of this state. "Chiropractic," being defined by statute as the science of palpating (feeling) the human spine and adjusting the segments thereof (removing the subluxation), is a definitely limited activity relating to a particularly limited kind of treatment. Other provisions of the statute just as clearly refer to the treatment of human ailments without the use of drugs or operative surgery which includes diagnosing and treating human ailments other than by palpation of the spine. The evidence submitted to the jury was sufficient to show appellant stepped out of the "chiropractic" field when limited to palpation, and the testimony in the light of the statute was admissible because appellant was charged with having diagnosed and treated human ailments.

The testimony of the physicians was what is commonly denominated expert testimony. The physicians were licensed practitioners of medicine in all its branches. Part of the testimony more properly falls within what is denominated the testimony of skilled witnesses. Some of the physicians had examined the plaintiff and were in a position to testify from their own examinations. The competency of such testimony being submitted to the court for judgment thereon in the light of the facts as to such competency, and the evidence being otherwise substantial and material, the court did not err in admitting it and later in refusing to strike it out. The subject matter covered by the statute is common

ground. The gravamen of the complaint was a negligent diagnosis of a human ailment.

The case of *Baxter* v. *Snow*, 78 Utah 217, 2 P. (2d) 257, 265, is cited as an authority for the proposition that, in the absence of expert testimony on the part of plaintiff in malpractice cases, there is not sufficient to take the case to the jury. The Baxter-Snow Case is not analogous to the case at bar. The case of *Perkins* v. *Trueblood*, 180 Cal. 437, 181 P. 642, is cited. Quoting from the case of *McGraw* v. *Kerr*, 23 Colo. App. 163, 128 P. 870, the following is said:

"Negligence on the part of a physician consists in his doing something which he should not have done. * * * What is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts and can be established only by their testimony."

The quotation would seem to justify the citation and argument. The *Baxter* v. *Snow Case* does not, either in decision or argument, go so far. It holds the doctrine of res ipsa loquitur does not apply to a malpractice case such as the case there under consideration, the court saying:

"We do not say that the rule, as to the necessity of expert testimony as stated in the cases referred to, applies in all malpractice actions. A treatment may so plainly indicate that the physician or surgeon was negligent, or that an act done or failed to be done so obviously did not involve skill, as not to require any opinion of an expert as to the performance or nonperformance of the act."

The following propositions submit rules of law either conceded by respondent or about which no controversy exists. The classifications to which they refer are recognized.

VII: "A mistake in diagnosis (and the Chiropractic counterpart, palpation or analysis) is not of itself sufficient to establish negligence."

IX: "A Chiropractor, or any Practitioner of a healing art, in a malpractice action, is liable, if at all, only for such damages as are

sustained solely through the alleged negligence of the Practitioner, and the Practitioner cannot be held answerable for any inconvenience, pain, suffering and other damage which resulted proximately from the initial injury."

X: "The negligence of the Defendant in a malpractice case must be shown affirmatively. It is not sufficient that there be a possibility of negligence."

XI: "The mere failure to effect a cure does not raise a presumption of a want of proper care, skill and negligence" (apparently means diligence).

From what has been said, the foregoing four propositions raise questions which might be presented as proper defenses in a cause against a physician or surgeon licensed to practice medicine and surgery in all its branches. It would seem to follow that one licensed to treat human ailments without the use of drugs or medicine or operative surgery, as long as he kept within the field of his license, should be subject to the same rules and by the same measure be liable or free from liability.

As to proposition XII: If the testimony as to the cause of the injury complained of were conjectural merely, the case should not go to the jury. This is so. Our examination of the record discloses that the cause of the injury, if the testimony of plaintiff is believed, is not merely conjectural, but is proved by substantial and sufficient competent evidence to take the cause to the jury. We may not disturb the verdict found upon competent, substantial, and material evidence no matter how sharp the conflict. *Utah Black Marble Co.* v. *American Marble & Onyx Co.*, 43 Utah 68, 133 P. 472; *Brostrom* v. *Lynch-Cannon Engineering Co.*, 46 Utah 103, 148 P. 423; *Morgan* v. *Ogden Union Ry. & Depot Co.*, 77 Utah 325, 294 P. 541. Numerous cases with varying situations are collected as an annotation to section 104-41-2, R. S. Utah 1933.

Appellant assigned error because of certain instructions given by the court and certain requests for instructions made by defendant which were refused. No exceptions were taken at the time of the trial by appel-

lant to the court's refusal to give the instructions requested by defendant. The exception taken was as follows:

"The defendant excepts to the court's instructions No. 5, 6, 7, 8, 10, and 11."

The exceptions to the instructions were as a whole. The exception did not even specify any particular instruction. The six instructions were grouped together. The "rule [is] too well established to be the subject of controversy that such an exception cannot be sustained if any part of the instruction is good." *Hansen* v. *Oregon S. L. R. Co.*, 55 Utah 577, 188 P. 852, 854; *McLaughlin* v. *Chief Consol. Min. Co.*, 62 Utah 532, 220 P. 726. In addition, the rule is that all parts of the charge to the jury must be construed together. When taken as a whole, if the charge is substantially correct and could not have misled the jury, the verdict and judgment will not be disturbed. This rule bears such unquestioned indorsement and the cases supporting it are so numerous as to make the citation of authorities unnecessary.

That doctors sometimes disagree and that mistakes occur is but part of the situation in which humanity finds itself. When we look to the testimony, there is ample evidence, if the jury believed it, from which they could find that appellant manipulated respondent's hip, pulled his leg, diagnosed his ailment, advised him as to what to do, and encouraged him over a long period of time that appellant's treatment would effect a cure.

That the treatment did not effect a cure is not a cause of action. Because one does not diagnose or treat a patient in the same way as another or use the other's methods, will not constitute malpractice, if the treatment employed has the approval of at least a respectable portion of the profession or is in accord with the standards of those recognized in the community to treat such ailments, and reasonable skill, learning, and diligence are manifest. Physicians or others authorized or licensed to treat human ailments are not insurers of a cure.

It may be suggested that the law requiring all persons desiring to be licensed to treat human ailments without the use of drugs or surgery to be examined in all the subjects prescribed by the statute and rules of the Department of Registration imposes a heavy burden. It may be ██ ██ so. Whether a person coming from a school of chiropractic training, by whatever title designated under the statute, if he undertakes to treat human ailments, should be required to have a knowledge of the subjects required of a practitioner of medicine and surgery in all its branches except those specified, is not for the court. The law was passed, not for the purpose of imposing burdens upon those desiring to qualify to treat human ailments, but to protect the public from what in the judgment of the Legislature was or might be detrimental to the public health. It is not the province of the court to concern itself about the policy of the law, that is exclusively a legislative function. When the law authorizes the practice of any of the useful professions, trades, or occupations, whether the licensee be designated as physician, surgeon, osteopath, homeopath, allopath, chiropractor, obstetrician, or by any other title, so long as the prescribed attainments are met the law is satisfied.

We find no error in the record. The judgment of the lower court is affirmed with costs to respondent.

HANSON and LARSON, JJ., concur.

WOLFE, Justice (dissenting).

The plaintiff, while carrying a heavy timber in July, 1933, slipped and fell, striking his left hip. He says the pains from the injury were severe. He went to his family physician, but on August 5 or 6, 1933, on recommendation of a friend, changed to Dr. A. B. Kesler, a chiropractor, who was licensed by the state of Utah to treat human ailments without the use of drugs and without operative surgery. The defendant and his witnesses no better described chiropractic

than is set forth in the case of *People* v. *Love*, 298 Ill. 304, 131 N. E. 809, 810, 16 A. L. R. 703, which I now quote:

"Chiropractic is a drugless method of treating ailments of the human body, chiefly by manipulations of the spinal column with the hand. The theory of this system, as explained in this record, is that, when the spinal column is in all its parts in place and performing its proper functions, and the nerves running therefrom to the various organs and parts of the body are undisturbed and performing their functions, many, but not all, of the ills to which the human body is susceptible do not and cannot take place. To state it differently and more understandingly, the theory of this science is that, if any of the vertebrae of the spine are seriously affected or partially dislocated, such affections or subluxations generally cause disturbances in various organs and parts of the body by reason of the fact that the nerves coming from the part of the spinal column affected or partially dislocated are impinged upon or pinched, and cannot by reason thereof perform their proper functions. It is claimed by the advocates of this system that these disturbances or bodily ills can be, and are many times, completely cured by the chiropractor by manipulating the spine with the hand and thereby removing the seat of the trouble. It is not claimed that all ills and diseases of the human body can be cured by this science or relieved, but that such ills and diseases as are caused by injuries and subluxations of the spinal column may be thus relieved and cured."

Plaintiff says that the pains became more severe and even intense when defendant gave him a first treatment about August 5, 1933. Some time in December following and during the continuous course of chiropractic treatments administered by Dr. Kesler, a small lump appeared on the left hip. Plaintiff says it was about two weeks before Christmas. Defendant says December 9th. Plaintiff says Kesler told him two or three times that he was suffering from rheumatism and when the lump appeared that it was a mere boil and not to worry, "that he would tell me when it was ripe, and that I could stick it with a pin or take a razor blade and cut it, or it would break while I was in bed at night"; that after it broke, Kesler told him not to worry about it and it would heal up in two or three weeks' time and "that the pus had to come out of my system before it could get well." Kes-

ler also told him to wash it with lysol; that on April 14th, he asked Kesler whether he did not think it more than a boil and was afraid it might be cancer, but Dr. Kesler again assured him not to worry, he was too young for that, whereupon he went to Dr. Sugden, a medical doctor. Kesler says when the lump appeared, he had a conversation with plaintiff who asked him what it was and, "I told him I didn't know; it resembled a boil; it might be a boil or it might be a carbuncle. It wasn't very large at that time, just making its appearance." He says plaintiff made no request that he do anything with reference to the lump; that he did not open or touch it, but told plaintiff "that was a field for medicine and he had better consult Dr. Martin, his family physician, about it." He told plaintiff to keep it clean if he was not going to his medical doctor with it and that plaintiff or some one else, but not he, put a gauze over it.

The lump came to a head and broke in about a week after it was noticeable. The defendant treated plaintiff up to April 14, 1934. During this time the hole grew from the size of a pinhole when it first broke to a size as big as a dollar. Dr. Kesler saw it three or four times a week as it was growing larger.

This gives in the main the evidence by plaintiff and defendant relating to the alleged diagnosis of the lump. I shall refer to the conflict in this evidence presently. The gist of the complaint is as follows:

"Defendant * * * failed to carefully, skillfully and properly diagnose and analyze plaintiff's injury and illness, but informed plaintiff that the pain he was suffering in his hip was merely rheumatism and caused by the plaintiff's spinal column being out of alignment * * * informed the plaintiff that he had a mere boil on his hip which would pass away upon being opened by plaintiff."

Also that

"defendant negligently * * * failed to prescribe a proper treatment for plaintiff in view of plaintiff's injury and illness, but adjusted plaintiff's spine over a period of approximately eight months for

another and different illness. which plaintiff did not have and from which he was not suffering, to-wit, rheumatism."

The main questions arising in this case appear to me to be as follows: (1) (a) Does a chiropractor by the very act of practicing his profession hold himself out as one who will diagnose ailments and does he by virtue of his very practice of chiropractic become responsible for diagnosis of ailments, or (b) by the fact of his practicing his profession does he only hold himself out as one who, by the technique known as palpation, is able to "analyze" the spine to determine whether there are some partial dislocations of the segments or vertebrae of the spine?

(2) If the answer to (1) (a) is in the negative, did Dr. Kesler step out of his field and actually diagnose this lump as a boil?

(3) If he did, may experts from the allopathic field of medicine testify as to whether such diagnosis was correct or whether the pronouncement from the diagnosis was, under the circumstances, such as one should expect from a person on whom the duty to diagnose devolved in view of the present state of pathological knowledge?

(4) Is there any duty on the part of a chiropractor to prescribe for ailments beyond that of treating them in the recognized way which a chiropractor treats all diseases, i. e., by adjustments and reducing the dislocations of vertebrae?

(5) If so, did defendant fail to prescribe a proper treatment in this case?

(6) Was the verdict in this case excessive in that the jury visited upon defendant compensation not only for results of his negligence, but for the results of the accident itself?

I shall consider the questions seriatim. As to the first: The statutes present one of those legislative monstrosities resulting from an attempt to satisfy two or more contending groups. In this case it appears as if the Legislature had attempted to pass a law which the allopath could contend

346

implied that the chiropractor was required to diagnose disease in the manner as required by the allopath and at the same time the chiropractor or other drugless healer could say implied that he was only required to treat the disease, whatever it might be, according to the method which he claimed would cure all diseases or all ailments outside of a certain excluded few. The main object seemed to be to appear to intend something without saying it was intended, thus placating each contending group. In this condition is the law served to us for interpretation. The statute defines chiropractic as "the science of palpating and adjusting the articulation of the spinal column by the hands only." True, the examinations to obtain a license as a chiropractor include all the subjects required for the practice of medicine and surgery in all its branches except certain named subjects. This means that the applicant for a license to practice chiropractic must take an examination in symptomatology. But I do not think it can be deduced from this fact that "one who has a license for and holds himself out as a chiropractor, holds himself out as one qualified to treat human ailments with all the qualifications of one holding a license to practice medicine in all its branches, excepting therefrom materia medica, therapeutics, surgery, obstetrics, and theory and practice." In the light of the definition of chiropractic, I do not think this can be so. The law may have required the chiropractor to gain information in symptomatology in order that he might know whether a person suffered from those diseases which manipulation of the spine might aggravate, and perhaps in order to make the requirements of practice stricter so as to cull out a certain number of incompetents and opportunists. In general medicine, every treatment differs according to the ailment found. Therefore, special affirmative diagnosis becomes not only important but indispensable.

In chiropractic, however, it is the theory that all except certain types of bodily disorders are due to an interruption of the flow of nerve force into a particular region, because

of impingement on a certain portion of the spinal cord by dislocation of vertebrae. However inadequate this may seem as an explanation of many or any of the bodily ailments, it is recognized by statute. The statute says,

"Chiropractic is defined as the science of palpating and adjusting the articulation of the spinal column by hands only."

It is true that no school of chiropractic is set aside by the statute except as it can be implied by the above definition and it is classed under general classification of the practice of medicine without the use of drugs or surgery, but I hardly think it can be said that the statute does not recognize such a school. The law recognizes not only what is expressly set out by statute, but what is contained in the word and definition of chiropractic. In many cases in the law it is required by definition to fill in the content of a word or words used by the statute. So, I think under the present state of the statutes there is recognized a school which does not pretend to infer or deduce from particular symptoms what disease or ailment the patient has, because it claims to cut under all those relationships between symptoms and ailments and to remove what it caims to be the cause of all of them. Thus, I suppose, tuberculosis, rheumatism in its many forms, and many other diseases would be claimed to be due to maladjustment of the vertebrae. And it seems to me that any person who engages a chiropractor, knowing him to be such, is presumed to know to whom he is going and what his theory is. Certainly, the public must assume some responsibility when it goes to naturopaths, osteopathists, chiropractors, etc.

The theory in which the chiropractor works is fairly common knowledge and, if not, a person who blindly patronizes a special school without knowing how far it professes to go, what its theory of treatment is, cannot be heard to say that he thought and expected it would perform outside of that field. As well might one claim he expected a Christian Science practitioner to prescribe drugs or surgery or diagnose

his ailment. All the law does is to protect a patron or patient by requiring a certain modicum of skill by the practitioner in the special field which he operates or else forbids him from practicing altogether if the law deems that the welfare of the public requires that the members of such school be not permitted to perform on the public. It was stated in *People* v. *Love,* supra, that:

"It is not the province of the courts to extol or belittle chiropractic, osteopathy, or medicine and surgery. They are all now established as useful professions, and as time has progressed it has been thoroughly demonstrated that all of them have accomplished, and are daily accomplishing, the relief and cure of human ailments."

It seems to me that to hold the chiropractor responsible for diagnosis in the sense which that word is used by the medical profession, that is, require him to conclude what ailment the patient is suffering from, which inevitably leads to the requirement of its corollary, that he use the skill in such diagnosis which is required of the average practitioner of medicine in that locality, would be to require something which the statutes by implication do not demand and to mistake the nature of the philosophy of chiropractic.

Section 79-9-17, R. S. 1933, states:

"Any person who shall diagnose, treat or profess to treat, or prescribe or advise for, any physical or mental ailment of, or any physical injury to, or any deformity of, another; or who shall operate upon another for any ailment, injury or deformity, shall be regarded as practicing medicine or treating human ailments."

But the reverse cannot be implied from this section: That any one who treats human ailments has the duty of diagnosing as that term is understood in general medicine. This section was a catchall in order to prevent unlicensed persons from actually practicing medicine or treating human ailments. Subsection (15) of section 79-9-18, R. S. 1933, defining one type of unprofessional conduct, reads as follows:

"(15) Advertising or professing publicly to treat human ailments under a system or school of treatment or practice other than that for which he holds a license."

Section 79-9-21, R. S. 1933, reads as follows:

"Any person, other than one licensed to practice medicine and surgery in all branches thereof, holding himself out as a physician or practitioner without indicating the school or system of healing in which he is licensed to practice is guilty of a misdemeanor."

It would seem as if these sections did recognize schools within the general field of treating human ailments without drugs or surgery.

It seems to me that these very sections were to require one not licensed to practice medicine and surgery to notify the public that he was limited to the field of special treatment and circumscribed diagnosis, called by the chiropractor "analysis." If the defendant held himself out as more than such special practitioner, the public might rely on an ability and a duty to diagnose. And we might inquire what would have been the effect if the defendant had diagnosed the ailment as osteomyelitis? Would he have quit treating the patient? Not if he stuck to his thesis that removing the impingement on the nerve would open up the channel for the flow of vital nerve force necessary to rebuild the part. I am of the opinion that, as said in the case of *Nelson* v. *Dahl,* 174 Minn. 574, 219 N. W. 941, 942:

"When a patient selects one of the several recognized schools of treatment, he thereby adopts and accepts the kind of treatment common to that school; and the care, skill, and diligence with which he is treated, when that becomes a question in the courts of this state, must be tested by the evidence of those who are trained and skilled in that particular school of treatment."

And whatever ailment he may suffer from, if among those which such school claims it can aid or cure, he places himself at the mercy of the treatment accorded by such school of practice. If it is unscientific or inadequate or bears no

relationship to a cure, the patient has his own judgment to blame. The law cannot give the members of the public intelligence or protect them against all the results of poor judgment or ignorance. If the law permits a school for treating human ailments to flourish, it can only require those who belong to it to use the technique of that school as skillfully as the average practitioner of such school performs with it. I think, therefore, that the answer to question (1) (a) must be in the negative; that is, that a chiropractor does not by the very act of his profession become responsible for the diagnosing of ailments in the sense that a doctor does in the regular school.

I next take up the second question: "Did Dr. Kesler step out of his field and actually diagnose this lump as a boil?" A few preliminary observations: It may be well to be realistic about this matter. Usually a patient coming to any practitioner, whether a general medical man or chiropractor, states how he feels and what his symptoms are. If the chiropractor takes upon himself to state what disease he has in terms of general medical science, he is diagnosing. If he takes tests for specific ailments or makes urine analyses which are only consistent with an attempt to know specifically what the patient is suffering from, he may be in the field of diagnosis. When the patient tells him how he feels and he makes the examination of the spine and concludes there is a subluxation, he is limited to treating such maladjustment in the manner and with the skill that may be reasonably expected of a competent chiropractor in this locality. If he deigns to name the ailment he is diagnosing. But if the ailment is not named nor any specific test to ascertain it is made, but only palpation, the patient submits himself to the chiropractic's theory of treatment and cannot complain if it fails to cure him or makes him worse. He takes that chance just as he does if he depends on a masseur to give him relief.

I now return to the specific case at hand. I have outlined the testimony of plaintiff and defendant as to what was

said regarding the lump. The jury, as was its duty, apparently decided that the defendant did denominate the lump as a boil. I can appreciate that if this lump had been totally unconnected with the condition for which plaintiff was being treated by Dr. Kesler, the latter's statement that it was a mere boil might have been just as gratuitous as if a chiropodist or masseur had volunteered that it was a boil. But here the lump was directly connected with the injury to the hip which was what Kesler was treating the plaintiff for. A diagnosis does not have to pass through a complicated preliminary process of examination and inquiry. One who is treating a patient for a certain condition who volunteers that a lump which it is later discovered is directly the result of an injury, is only a boil, has passed professionally and not as a mere volunteer on the nature of the symptom. He has therefore diagnosed the ailment. And, having assumed to diagnose the ailment, he is charged with the same duty in reference thereto as is a physician of the regular school, and, if through ignorance, below the standard required, or because of carelessness he misjudges the cause of the symptom, when he should have known the natural processes which had been or were producing it, he is guilty of negligence. The jury believed that defendant, in the course of his professional treatment of plaintiff, failed through ignorance, when he had the duty of knowing, to properly diagnose or call the true nature of the lump. While it might be that when the lump first appeared, a failure to recognize its true nature might be excusable, but, when the cavity grew in size over four months, the jury might well conclude from the evidence of the witnesses for the plaintiff that there was negligence in failing to properly recognize it.

I shall consider in a moment whether those witnesses were qualified to give opinions as to what should be expected in the way of diagnosis of one upon whom the duty to diagnose devolved. Before I come to that, which is the third question above propounded, I shall again consider whether plaintiff can complain, if, as before stated, he put himself into a

chiropractor's hands for treatment according to that school regardless of what was causing his condition. The answer is that while plaintiff, who was suffering pain, put himself in the practitioner's hands for relief of that condition, he had a right, when asking concerning a specific symptom connected with the condition he was being treated for, to receive word either that the chiropractor did not know or that he refused to give an opinion or render a judgment, or if he did denominate it by name, that such name was the result of a conclusion based on proper care and skill in diagnosis. When a chiropractor who is licensed to treat human ailments in a certain way, without naming the ailment or without specifying what a symptom denotes or without designating a condition or its manifestations, all of which the law seems to permit, departs from this field of palpation and adjustment and deigns to give to a patient information as to the nature of his ailment, the meaning of a symptom, or interpret a condition or symptom in terms used by the general school of medicine, he then knows or should know that his patient has the right to guide his future conduct by such advice, information, or interpretation, and that such patient may or may not desire to remain with his treatment. He therefore has the duty to use such skill in the ascertainment of the information or in coming to an opinion or in the giving of advice in reference to such ailment, symptom, or condition as has the person who is licensed to practice medicine in all its branches. Not an answer is it to say that the patient might or most likely would not have changed his course of action. If he ventures the advice or information, he must give the patient the opportunity to exercise a choice on the kind of information or advice it is his duty to furnish.

The answer to question (3) is, in the light of the answer to question (2), simple. A distinction must be made between what the chiropractor calls palpation—his peculiar "analysis" or "diagnosis"—and the diagnosis of the medical doctor, and between these two and treatment or "adjust-

ment" of the chiropractor. If the question was as to whether the defendant had made such palpation or given such chiropractic treatment as one was entitled to expect from the reasonably skillful chiropractor in this locality in view of the advances, if any, in the technique, the defendant would be correct in his contentions. But when he steps out of his field and diagnoses in the fashion of the medical man, then the medical man may be called in to testify as to whether under the circumstances the diagnosis was of the sort which met the requirements of the standard of diagnosis of the medical profession in that locality. And they certainly may testify, if qualified, as to the effect on plaintiff of a delayed correct diagnosis. The authorities cited by plaintiff and defendant are not in conflict on this point. It is that some of those which defendant cites to uphold his point that a medical man cannot testify in a chiropractic case, are as to treatment and not as to a medical diagnosis.

The answer to question (4) is already apparent from what has been said heretofore. If the chiropractor sticks to his last and does not diagnose beyond palpation and does not go beyond his field, the patient knows or should know that he prescribes for every ailment which chiropractors claim to be able to cure, only the adjustments to be made on the spine. The gravamen of the charge in this case is failure skillfully and carefully to diagnose after he entered the field of telling plaintiff what the lump was on his hip. It was not that defendant "negligently and carelessly failed to prescribe a *proper* treatment." If this were so, every chiropractor might be sued out of business whenever a doctor of the regular school testified that chiropractic was not the proper treatment. I have but little doubt that there are ailments which chiropractic should not treat, but if a patient is willing to trust himself to the chiropractor without obtaining from a medical doctor definite diagnosis of what ails him, it is the patient's, not the law's nor the chiropractor's responsibility. This is, of course, subject to what has above been said that if the chiropractor does deign to tell what the ailment is,

he then becomes responsible for a skillful and careful diagnosis and for damages for injuries which may result from the absence of application of such skill and care.

The answer to question (5) depends on whether the school of chiropractic purports to treat osteomyelitis by "adjustments." If not, the defendant did not prescribe proper treatment from the chiropractic point of view. If the school does recognize osteomyelitis as amenable to chiropractic treatment, then he would have been prescribing proper treatment from the viewpoint of the chiropractor. There is no evidence in the record as to whether the school claims that its treatments will cure this ailment.

As to question (6) : Certainly, the size of the verdict must ordinarily be left to the jury, but in this case there seems to be some merit to the contention that the jury may have visited upon the doctor compensation for the injury due to the fall rather than the damage which plaintiff suffered by reason of the delayed correct diagnosis. The court's instruction No. 11 would give the jury cause for so finding. Of course, if, after the time when the nature of the disease should reasonably have been discovered by one required to make a careful diagnosis, the impairment increased by virtue of the widening bone region affected so as to make what would have been confined to an affectation of a small area, into a much wider area, the verdict may reflect the damage resulting from such failure to discover the true nature of the disease. But from instruction No. 11 we do not know that. As hereunder pointed out we have evidence to the effect that the point at which a proper diagnosis could have been expected to reveal the real nature of the ailment was when the lump first appeared. As said previously, the defendant would not in any case be liable for any impairment which happened before he stated the lump was a boil, if osteomyelitis was within the realm of those diseases which chiropractic holds are amenable to spinal adjustments. This topic is related to the court's instruction No. 11 which is hereunder considered.

As to instructions: From what has been said above, it follows that defendant's requested instructions 2 and 9 might have been proper if the action were based on failure properly to treat. From what has been said in answer to question (2) the action was based upon failure carefully to diagnose when he purported to diagnose. The court's instruction 5 covers this point. The word "assume" used in the instruction and criticized by defendant must be given the meaning which fits the very act which plaintiff testified that the defendant did and which apparently was believed by the jury. I think there was no error in refusing to give defendant's requested instructions Nos. 5 and 7. The first was covered by the court's instructions. The second was based on the assumption that the evidence shows contributory negligence. I think not. The court's instruction No. 6 was not erroneous. There was no evidence to the contrary that the so-called "boil" was a symptom of osteomyelitis. It followed inevitably from the evidence that if the jury found that the defendant had stated the lump to be "a mere boil"— thus purporting to diagnose—and the jury further found that he should have known on careful diagnosis that it was not a boil, it should find for plaintiff, provided that it came to the conclusion that the plaintiff was injured by the diagnosis as a boil, which last should perhaps be in the instruction.

I think the court's 8th instruction erroneous, because it states that defendant may have lulled plaintiff into security for a period of approximately six months into believing the ailment a mere boil. The evidence is that the lump first made its appearance not before December 9th and on April 14th plaintiff went to Dr. Sugden. The period could not have been over four months. I think the court's instruction No. 11 erroneous as a whole. It reads as follows:

"11. You are instructed that if you find from the evidence that the infection in plaintiff's hip bone would likely have been completely eradicated therefrom provided the same had been observed by defendant at the time when the same commenced or soon there-

after, and that by allowing the infectious condition to remain in the hip bone for a period of approximately six to seven months after the said infection had commenced the same spread over a greater portion of the hip bone so that eradication thereof became impossible, then you shall find that plaintiff has suffered damage and injury because of the failure of the defendant to so observe the infection."

It is predicated on the theory that it was the duty of defendant to observe the infection "at the time it commenced or soon thereafter," when there was no such duty visited upon the defendant until December 9th, at which time he mistakenly informed plaintiff it was a boil. From the time of the injury before August 5th until the lump came into evidence on December 9th, the infection was going on. The so-called "boil" appeared when the infection had worked its way through the flesh and made an exit. Dr. Sugden testified it would be difficult to diagnose osteomyelitis in its early stages. Dr. Holbrook testified that the first time you could be sure to say you had osteomyelitis is when the little lump began to appear. Both of these witnesses were for the respondent. There is no contrary testimony. The instruction further assumes that the jury may, from the evidence, find that the defendant was guilty of allowing the infection to remain in the hip bone from six to seven months, whereby plaintiff may have been prevented from completely eradicating it. The evidence, as stated above, was that the defendant could not be held for more than about four months. This instruction No. 11 is bad as a whole. An exception was taken to the giving of instructions Nos. 5, 6, 7, 8, 10, and 11, without specifying parts of any. This would mean that we must find any one of them bad as a whole. I do not think we are required to find every one of the whole group bad as a whole. I see no use in a litigant being required to lengthen the record by setting out in separate sentences his exception to the whole of each instruction. I think the giving of instruction No. 11, as a whole, was prejudicial error, because the jury might well have concluded that

the defendant had the duty to discover the infection at the time when the infection in the hip bone commenced or soon thereafter. No medical doctor may have been able to do that.

For the reasons stated, I think the judgment of the lower court should be reversed and the cause remanded to the district court of Salt Lake county with instructions to grant a new trial.

FOLLAND, Chief Justice (dissenting).

I concur in the dissenting opinion of Mr. Justice Wolfe.