## FREDRICKSON v. MAW et al.

No. 7452. Decided February 20, 1951. (227 P. 2d 772.)

See 48 C. J. Physicians and Surgeons, Sec. 158. Necessity of expert evidence to support malpractive action, see note 141 A. L. R. 19. See, also, 41 Am. Jur. 213.

*Skeen Thurman & Worsley, Earl Jay Groth,* all of Salt Lake City, for appellants.

*H. A. Rich, Leonard W. Elton,* Salt Lake City, for respondent.

LATIMER, Justice.

This is an appeal by the defendants from a judgment entered against them in an action for damages alleged to have been sustained by plaintiff as a result of the carelessness and negligence of the defendant, Dr. Raymond B. Maw, in performing a tonsillectomy. We shall designate the parties as they appeared in the court below and proceed in the opinion as though the action was against Dr. Maw individually. The charge of negligence was that the defendant carelessly left gauze, dressings, threads, and sutures in the tonsil cavity; negligently permitted the incision to close with materials remaining therein; and negligently discharged the plaintiff as healed without discovering the presence of the foreign substances.

The principal error complained of on this appeal is that the trial judge improperly overruled defendant's motion for a nonsuit and a directed verdict for the reason that there was no evidence to establish that the defendant was negligent in the manner alleged, or at all.

In view of the nature of the evidence, before summarizing it to establish negligence or lack of negligence, we desire to discuss the principles of law dealing with the evidence necessary to establish malpractice of the alleged type.

The better-reasoned cases announce a rule of law to the effect that in those cases which depend upon knowledge of the scientific effect of medicine, the results of surgery, or whether the attending physician exercised the ordinary care, skill and knowledge required of doctors in the community which he serves, must ordinarily be established by the testimony of physicians and surgeons. There is, however, another well-recognized rule holding that when facts may be ascertained by the ordinary use of the senses of lay witnesses, it is not necessary that expert testimony be produced and relied upon.

Included within the latter rule are those cases which are similar to this one, namely, those actions involving negli-

gence in leaving instruments, needles, sponges, bandages, gauze or foreign particles in incisions, wounds, or open cavities. So far as establishing negligence on the part of the doctor in this type of case is concerned, it would appear to be a matter of common knowledge that due care is lacking if surgical instruments, sponges, or medical ■ supplies are not removed before an incision is closed or the wound heals; and lack of direct evidence of the failure to remove is not fatal to plaintiff's case when there is evidence from which an inference to that effect may legitimately be drawn.

The rule is stated in the case of *Wharton* v. *Warner*, 1913, 75 Wash. 470, 135 P. 235, 237, in the following language:

"It is argued on behalf of the respondent Warner (1) That whether a surgical operation was unskillfully performed is a question of science, and is to be determined by the opinion evidence of surgeons; and (2) in effect that a bad result standing alone is no evidence of unskillful surgery. From these postulates it is argued that there is no evidence to sustain the verdict. Both propositions are sound when soundly applied. The reason is that in most cases a layman can have no knowledge whether the proper medicine was administered or the proper surgical treatment given. Whether a surgical operation was unskillfully or skillfully performed is a scientific question. If, however, a surgeon should lose the instrument with which he operates in the incision which he makes in his patient, it would seem as a matter of common sense that scientfic opinion could throw little light on the subject. So, in this case, where a surgeon loses a metallic spring about 12 inches in length, and about one-sixteenth of an inch in width, in the body of his patient, and fails to discover and remove it, it would seem that a jury would have abundant justification for inferring negligence without the aid of expert testimony."

With these principles in mind, we summarize the material testimony of the witnesses, taking into consideration that plaintiff is entitled to the benefit of the evidence and inferences favorable to her as the jury rendered a verdict against the defendant.

Mrs. Fredrickson testified that prior to the 6th day of July, 1945, she was in good health, except a stiffness of one knee caused by arthritis; that on that date she went to the Intermountain Clinic, operated by a partnership of which

the defendant was one partner; that the purpose of her visit was to seek relief for her arthritic affliction; that she was given a physical examination and was then directed to the defendant; that he examined her throat and recommended the removal of her tonsils as the right one was diseased; that she was informed that their removal might help relieve the arthritic condition; that she concluded to have her tonsils removed, received an appointment with the defendant, and on July 17, 1945, reported for the operation; that she was given a local anesthetic and the tonsils were removed by the defendant; that the operation consumed about an hour's time and it was necessary that the doctor use gauze sponges; that after the operation was complete she was permitted to leave the clinic and was told to return in about three weeks for a check-up.

She further testified that during this three-week period her throat was sore and she had considerable difficulty swallowing; that she returned within the period as directed but the defendant was on his vacation and so the nurse examined her throat; that she informed the nurse of her difficulty in swallowing and explained that it felt like she had a lump in her throat; that the nurse replied it was the ties on the vessels in the tonsil area which were causing the difficulty; that she was not directed to return, but due to the fact that her throat was giving her considerable difficulty, towards the latter part of August, 1945, she called on the phone and asked to talk to the defendant, but was informed he was busy; that she talked with the nurse and in this telephone conversation she informed the nurse her throat was sore; that she overheard the nurse tell the defendant that she, the nurse, had observed an ulcer in her throat and she heard the defendant reply to the nurse to have plaintiff return for further treatment; that the defendant examined her throat, told plaintiff there was a little drainage from the head and tonsil area which was causing her throat irritation, treated her sinuses and pre-

scribed a mouth wash; that she was not instructed to return, but about every three or four weeks after that for a period of about a year and a half she went to see the defendant; that in October, 1947, she had an ulcer on the side of her tongue which was medicated and defendant had a blood sample taken for analysis for possible cancer; that during the three-year period of time her throat was sore and she was treated largely for sinus trouble, although prior to the operation she had never had any sinus disorder; that the last time she went to the clinic for treatment was on June 29, 1948.

Continuing with plaintiff's testimony, she stated that due to the fact that during this period she was not getting any relief from her pain and suffering, she consulted with twelve doctors and dentists; that among these were her family physician and her dentist; that the former prescribed penicillin treatment, the latter examined her mouth, but at that time referred her to a physician, Dr. Johnson; that he examined her mouth and prescribed sulpha and penicillin treatments; that in January, 1946, she returned to Dr. Wright, the dentist, who extracted eighteen front teeth; that the rear teeth were not extracted as they had been taken out approximately 30 years before; that Dr. Wright did not use any packs, absorbent cotton or any fabric materials in her mouth; that he made a set of dentures, but due to the condition of her mouth she was unable to use them satisfactorily; that Dr. Wright referred her back to her family physician, who treated her further with penicillin; that at this time she was bothered with an ulcer in the tonsil area; that in April 1946 and some time in 1947 she consulted another dentist and in 1947 another set of dentures was made by Dr. Wright but she was unable to use them; that in July, 1947, she visited an oral surgeon, Dr. Browning, who opened up the gums of the lower jaw and cleaned out the infection; that Dr. Browning did not use any packs, gauze or cotton in her mouth, neither did he per-

form any surgery in the back of her mouth or around the tonsil area; that during this time her throat was giving her considerable trouble and there were ulcers in the tonsil area and along the side of her tongue; that she was advised that the condition of her throat might be caused by cancer and she consulted two cancer specialists who advised her that her trouble was from infection and not from cancer; that she was treated by another general practitioner, Dr. Argyle, who treated her for infection of the mouth, and throat, gave her hormone and penicillin shots and recommended a mouth wash; that none of these doctors or specialists, except Dr. Browning, did any surgery or cutting in her mouth or placed gauze or sponges in her mouth; that during May, 1948, Dr. Browning and Dr. Sears examined her throat and referred her to Dr. Dolowitz, a throat specialist whom she consulted about May 10, 1948; that at this time there was an ulcer approximately the size of a dime on the left side of her throat above the tonsil area; that Dr. Dolowitz took a biopsy, prescribed some medicine and told her to return in a couple of days; that she returned for the appointment but nothing further was done by the doctor until June 24, 1948, when he took another and deeper biopsy; that two days later, on June 26, 1948, about 9:30 a. m., the ulcer on the left side just above the tonsil area was giving her considerable trouble; that she was attempting to wash it with peroxide water when it felt as though it had broken open and she observed something exuding from the sore; that she took a pair of tweezers and pulled on it but was unable to get it extracted; that it appeared to be a piece of gauze covered with pus; that she became nervous and excited and was unable to get it out so she went next door and consulted with a neighbor, Mrs. Mathews; that the neighbor observed the condition; that plaintiff decided to consult Dr. Dolowitz immediately; that she drove to the home of her daughter-in-law, who observed the foreign material in her throat, and who accompanied her to the doctor's office;

that they were required to wait approximately two hours before the doctor examined plaintiff; that prior to this and in her excitment she had apparently swallowed the matterated material; that Dr. Dolowitz cleaned out the area and sprayed it with penicillin; that he pulled out some strings from the ulcerated area; showed them to her and prescribed penicillin treatments every eight hours, that she concluded she had swallowed the gauze material and upon returning home recovered it from a stool; that she preserved the gauze by keeping it in alcohol, it was turned over to a local chemist who analyzed the material; that she returned for further treatments to Dr. Dolowitz, who on subsequent occasions pulled other threads from the ulcerated areas; that Dr. Dolowitz did not use any packs, gauze or cotton in her mouth; that during the whole period from the time of the tonsillectomy until the gauze and threads were removed she was bothered with a sore throat and continuously sought medical assistance in attempting to clear up the difficulties; that during this period the ulcers would appear and disappear somewhere in the tonsil area, the ones on the left side being in the tonsil area and between the tonsil area and where the upper left wisdom tooth would be located; the ones on the right near the cheek in the tonsil area.

Plaintiff's evidence was corroborated in part by Mrs. Vera Mathews, Mrs. Ellen Rupp; her husband, Sherman Fredrickson; her daughter-in-law, Betty Fredrickson; the Salt Lake City chemist, N. E. McLachlin; and Doctors E. W. Browning, O. O. Wright, and D. A. Dolowitz. A short resume of their testimony follows:

Mrs. Mathews testified that she was a friend of plaintiff and visited with her at frequent intervals; that on June 26, 1948, she saw plaintiff at the witness' home and at plaintiff's request she observed the condition of her throat; that she saw some cotton and gauze protruding from the

ulcerated area on the left side of her throat; that plaintiff, prior to the tonsillectomy, had always appeared to be in good health, but after the operation she commenced having trouble with her throat and mouth, lost weight and became extremely nervous; that after the summer of 1948 plaintiff regained weight and her mental and nervous condition improved.

Mrs. Rupp testified that she was a friend of plaintiff; that on June 26, 1948, at plaintiff's home she observed the condition of plaintiff's throat; that plaintiff had a sore in the back of her mouth; that it was inflamed and there appeared to be a piece of gauze hanging from the ulcerated area.

Mr. Fredrickson testified as to his wife's prior good health, her impaired physical condition from the time of the tonsillectomy until the summer of 1948, and her improved condition after the removal of the foreign substances causing her throat irritation. He further testified that plaintiff had some teeth removed 20 to 25 years before the tonsillectomy; that Dr. Wright had not extracted any of plaintiff's teeth before he removed the eighteen in 1946; and that he talked with the defendant in April or May, 1948, and the defendant told him plaintiff had a sore mouth.

Mrs. Betty Fredrickson testified that she was a daughter-in-law of plaintiff and maintained a close relationship with her; that after the tonsil operation plaintiff had sores and ulcers that appeared in various places around in the back of her mouth and throat; that plaintiff drove to the witness' home on June 26, 1948, and requested the witness to look at the condition of her throat; that witness saw what appeared to be a piece of gauze and other foreign materials which appeared to be threads; that there was a small tip showing, but the bulk of the material appeared to be embedded in the ulcerated area; that she accompanied plaintiff to the office of Dr. Dolowitz and observed him extract some

threads; that the infected area she saw on June 25, 1948, was about three-fourths of an inch in diameter in the back of the throat, less than an inch from the center.

Mr. McLachlin testified that he was the city chemist and that he analyzed certain materials furnished him by plaintiff's counsel (these were connected up as the materials rescued by plaintiff); that he concluded they were small strings, solids or fibers of cotton; that his analysis indicated that one of the pieces appeared to be a substance similar to catgut; and that he did not see any fragments of a bony substance.

Dr. Browning testified that he treated plaintiff on July 7, 21 and 25 of 1947; that he took X-rays of plaintiff's gums and on July 21st opened the lower anterior region; that there was a very sharp ridge which was removed to eliminate the trouble plaintiff was encountering in using her dentures; that on July 25th he opened the upper area from the first molar to the first molar and curetted it; that he did not use any packs, sponges or gauze and no sutures were put in plaintiff's mouth; that she was in his office many times complaining of a sore throat; that her mouth was inflamed and at one time he saw a lesion near the very back edge of the soft palate; that the tonsil area was involved in the inflammation that he had observed; that the ulceration was removed from the tonsil area but the distance of removal was not "too much," that it was over the tonsil area and extended to the soft palate covering the tonsil area.

Dr. Wright testified that he had known Mrs. Fredrickson since May of 1939; that her molar teeth had been removed prior to that date; that on January 26, 1946, he extracted eighteen front teeth; that this was the only occasion when he extracted any teeth; that about three months before this extraction he was consulted by plaintiff because she was having trouble with her throat and she wondered if it was caused by the condition of her teeth; that he advised

her he did not believe the teeth were causing the trouble, but upon her request he extracted them; that he did not use any gauze or packs in her mouth; that he treated her in 1939 at which time he put in one filling; that in 1940 and 1942 he cleaned her teeth; that in 1943 he X-rayed her teeth and in 1944 he put in three fillings.

Dr. Dolowitz testified that he specialized in eye, ear, nose and throat diseases; that he met plaintiff on May 10, 1948; that the tissue in the nasal pharynx was red and angry-looking; that he observed a small lesion about one-half inch square on the left side of her throat at the junction of the hard and soft palate; that it was a small ulcer with a pussy exudate; that it would be about two-thirds of the way to the normal position of the rear molar in the upper left side of the anterior pillar of the tonsil; that the location was a guess or estimation; that on May 14, 1948, he made another examination of plaintiff's throat; that there was still a good-sized ulcer which seemed to be slightly closer to the gum, probably because of the biopsy which he had previously taken; that on May 29, 1948, the ulcer had healed but there was another one behind the gum on the soft palate; that on June 24th, the first ulcer had reappeared and because the pathologist had requested a deep biopsy he removed the whole ulcer, probing very deeply; that on the 26th day of June, 1948, plaintiff was examined and there was a small abscess opposite the last, lower molar; that on arriving plaintiff reported that the abscess had ruptured just before she arrived and a sluff of dry blood and cotton came out of it; that she brought in a thread that was about an inch long; that the sluff was about an inch in diameter and one-half inch deep; that the area appeared like a boil after it had opened; that plaintiff further stated she had pulled on the piece of gauze, was unsuccessful in removing it at her home, but apparently in her excitement it had broken loose and she had swallowed it; that when she was examined there was a hole with three or four pieces of string in it which he

removed; that plaintiff returned on the first day of July, 1948; that the socket had healed but was not well; that he opened the ulcer and removed six tiny threads; that plaintiff was examined on July 29, 1948, and a small ulcer was found on the right side about the same relative position as the one on the left; that on that occasion he removed a small bone chip but subsequently a small white hard mass worked to the surface and it was removed by biopsy forceps; that on October 25, 1948, he noticed a slight granulation or healing formation on the left side just lateral to the fossa; that on the 15th day of November, 1948, he again treated plaintiff, found two lesions and there was a slight healing of these wounds on the right side over the tonsil area; that he also found some granulation present at the site of the first ulcer and there was one thread exuding from that area which he removed; that on the 16th day of November, 1948, plaintiff was again examined and he found that the swelling had spread around to the cheek side just behind the teeth area and he removed a thread from there; that when plaintiff first was examined he suspected cancer, but after the biopsy indicated otherwise, he started to find what was causing the trouble; that when the threads exuded and the ulcer started healing it healed from the bottom up requiring him to keep the top open; that the ulcers were occurring and reoccurring constantly and continued to the date he last saw plaintiff on September 15, 1949; that he thought it unlikely that the gauze and threads he removed could have migrated from the tonsil fossa to the place where removed, but that in reading the history of cases practically anything is possible and that while his experience indicated that migration is usually downward, it is possible for a foreign substance to migrate laterally.

To point up the dispute in some of the evidence and to bring into bold relief defendant's contentions which are based on the opinion of some of the medical experts, we summarize the evidence introduced by the defendant:

The defendant testified that in performing the tonsillectomy a grasping fork was used to take hold of the tonsil which was then separated from the connecting tissue by instruments; that the tonsil is bisected away from the connecting tissue and then clipped off with a snare; that when the tonsil is removed there is no cavity; that when a person swallows food or water it would remove foreign material from the tonsil fossa; that there is no hole remaining there and there is no place for gauze or surgical dressings to stay; that gauze sponges were used in the operation but they were held by a locked hemostat; that there were some little bleeders which he tied with catgut; that no suturing was done at the time of the operation; that he did not leave gauze or sponge material in the tonsil area; that on August 18, 1945, when he next saw plaintiff there was complete healing in the area of the tonsil; that there was no open cavity and the area had returned to its natural position; that on September 4, 1945, when respondent was next examined some pus was seen coming from her sinuses, but the tonsil area was perfectly normal; that on October 28, 1947, plaintiff was examined and complained of pain in the vicinity of the second or third upper molars; that the gauze sponge used by him in the operation was the large type used when there is a severe hemorrhage; that plaintiff complained of a sore throat every time she came in but he saw nothing except the chronic inflamed pharynx; that on October 3, 1946, she complained of a dry sore throat especially on the right side; and that he could not see evidence of anything that was causing her discomfort.

Dr. Muirhead testified that he saw plaintiff on April 5, 1946; that she sought treatment from him because of swelling, pain and discomfort in her throat; and that in his examination he observed the tonsil area and the tonsils were out cleanly.

Dr. Robert G. Snow, an eye, ear, nose and throat spe-

cialist, testified the tonsils are roughly about the size of the thumb from the first joint to the fingernail and about one-half inch deep; that they may become enlarged with disease; that the cavity after the tonsil is removed is called the fossa; that it is exactly the size of the tonsil; that sometimes the tonsils appear small but upon taking them out they are found to be from one-half to three-quarters of an inch deep; that after the tonsil is removed the area between the pillars fills with scar tissue and is skinned over with mucous membrane, the lining of the throat; when the tonsils are removed scar tissue commences to be formed; that if during the tonsillectomy sponges or other materials were left in the fossa they would not stay there more than twenty minutes after the patient sat up or stood erect; that swallowing, either voluntary or involuntary, would force them out; that the maximum time a piece of gauze could remain in the fossa would probably be an hour; that if the pillars were sewed together over the gauze the maximum time of remaining would be five to six days for in that time the stitches in the pillars would sluff away or pull out; that if a piece of gauze or thread had been left in the fossa it could not have migrated through the tissue to any of the ulcer areas identified by Dr. Dolowitz; that the witness had read of practice of controlling hemorrhage in a tonsillectomy by putting a pack in the tonsil area and suturing it, but the practice was condemned; that it would not be good practice to leave a piece of sponge or gauze in the throat; that if the materials were to become embedded in the tonsil area and then covered over by scar tissue they would be expelled as a little abscess; that in order to bury a piece of gauze in the fossa you would have to make an incision through the muscle and bury it deep in the muscle; that if a piece of gauze came out of an ulcer it was exuded within thirty to sixty days from the time it was left in the area; that this was not true of small pieces of thread not causing abscess formations as they have found in people's bodies

years after having been inserted.

Dr. Cleary testified that if a piece of gauze were left unattached by sutures in the back of the fossa the patient as he sat up or stood erect would either spit it out or swallow it. There would only be those two possibilities; that if the gauze were left in the cavity and the two pillars sutured together with the catgut, the suture would be dissolved and the material would come out within the course of a few days; and that if the pillars were sutured with catgut over a pledget the sutures would tear loose within 24 hours.

Mrs. Ellis testified that she was the nurse who assisted Dr. Maw in performing the tonsillectomy; that during the course of the operation defendant used gauze sponges to tap the blood as it came from the area; that she had observed the mouth and throat of patients following many tonsillectomies and if a small pack or sponge were there it would be observable by anyone looking into the tonsil fossa.

It will be observed that the quoted evidence places squarely before us the question of whether the facts and circumstances shown by plaintiff are sufficient to pose a question of fact for jury consideration when the expert testimony is largely to the effect that surgical materials could not remain and become embedded in the tonsil fossa; and, even assuming they could, that migration laterally is unlikely. Perhaps the following paraphrased words of Dr. Dolowitz point up the question:

"As a matter of fact, in reading the cases, practically anything is possible. There are migratory bodies and numerous instances of the most fantastic things. Weird things happen, but usually the migration is downward, and this has been my observation. It is possible for them to migrate laterally."

It might simplify the problem to analyze the evidence the jury could base its findings on in the reverse order of events. Clearly the jury could find that there was embedded in and taken from plaintiff's throat threads, gauze and possibly catgut. The evidence on this comes from both

interested and disinterested witnesses. The proximity of the ulcers to the tonsil fossa area is in dispute, but there is little question but that the ulcers broke out in different places. The witnesses described the locations as on the tonsil fossa, in the soft palate covering the tonsil fossa, over the fossa area, behind the last tooth on the soft palate, and between the last tooth and the tonsil two-thirds distance from the tonsil. Likewise, the testimony as to the size of the ulcers varies, but the one from which the mass supposedly exuded was described by Dr. Dolowitz as approximately one-half inch square, and by the plaintiff as about the size of a dime. These variations in testimony are not unusual as the witnesses were testifying from memory after a lapse of approximately eighteen months.

The next question for the jury to determine would be the means by which the gauze or thread could get into plaintiff's throat. There are three possible explanations suggested by counsel: First, the materials were placed there when plaintiff's molar teeth were extracted; second, they were placed in plaintiff's mouth by Dr. Wright at the time he extracted the eighteen front teeth; and third, they were left there by the defendant when he performed the tonsillectomy.

There is no evidence which would justify the jury in concluding the threads and gauze were embedded in the gums at the time the molars were extracted. The doctor performing the extraction was dead and the evidence was not introduced showing the need of sponges or gauze or what material he used, if any, in packing the sockets. Dr. Wright's testimony would suggest that cotton sponges were not necessary, as when plaintiff's front teeth were removed he did not use any packing because plaintiff was found to be not of the bleeding type. Moreover, during the twenty-five to thirty intervening years, plaintiff had not encountered any pain and suffering in her gums or in her

throat and the cutting done in the operation was not around the gums. It would be most unlikely that the foreign materials would remain quiescent for such a long period of time and then light up immediately following the tonsillectomy. While the jury could find that some of the ulcers were closer to the sockets of the molars than they were to the tonsil fossa, a finding that the threads migrated from the sockets must be rejected without some evidence or some circumstance to establish that cotton packing made up in part of woven threads was placed in the socket. The inference that plaintiff's trouble came from this source approaches absurdity when consideration is given to the many missing links necessary to furnish a foundation for the inference and when further consideration is given to the anatomical structure through which the threads would be required to migrate to get from the sockets to the ulcerated areas. There is little wonder the jury disregarded this hypothesis.

The second method is without supporting evidence. While Dr. Wright extracted eighteen teeth positioned in the front of plaintiff's mouth, defendant makes mention of the fact that Dr. Wright may have extracted some teeth upon an earlier occasion, but the doctor testified that he did not know plaintiff prior to 1939 and he did not extract any teeth other than the eighteen. Conceding that he testified gauze packings were used by him in certain instances when the patient was bleeding, his evidence is undisputed that in his treatment of plaintiff he did not use cotton materials to stop the flow of blood as her teeth came out with little difficulty and she was not a bleeder. In addition, the evidence is conclusive that plaintiff was suffering from a sore throat prior to the time she consulted Dr. Wright and the purpose for extracting the teeth was to remove that possible source of irritation. The jury could not reasonably conclude that the foreign materials found in plaintiff's mouth were traceable to the treatment given

by Dr. Wright and had migrated from the front teeth sockets to the tonsil area.

This brings us to the last explanation and the question whether the evidence permits the jury to find from the evidence that defendant left the materials in █ plaintiff's mouth while removing the tonsils.

The defendant contends that no witnesses testified to having seen defendant leave any foreign material in the tonsil area. This must be conceded, but the failure of direct evidence does not defeat plaintiff's claim. As was said by the Supreme Court of Michigan in the case of *Winchester* v. *Chabut,* 321 Mich. 114, 32 N. W. 2d 358, 360:

> "Defendant contends that the court should have directed a verdict for him because there was neither direct nor medical nor scientific evidence establishing or tending to establish the leaving of a sponge in the wound and no evidence of malpractice. Lack of direct evidence of the alleged act of negligence is not fatal to plaintiff's case when there is evidence from which an inference to that effect may legitimately be drawn. *LeFaive* v. *Asselin,* 262 Mich. 443, 247 N. W. 911."

The test, therefore, is whether there is evidence from which a jury could reasonably infer that defendant left the materials in the fossa area. We believe that from the following facts and circumstances, which the jury could find, a reasonable inference could be made: Prior to the tonsillectomy, plaintiff had not encountered any difficulty with her throat and mouth; the defendant performed the operation after examining her throat and finding only a diseased tonsil. In the course of removing the tonsils, he used gauze sponges to mop the fossa and used catgut to tie the bleeding vessels. He did not see the plaintiff again for thirty days and prior to this time scar tissue would have formed and might have covered up any materials left in the tonsil fossa. The depth of the fossa could have been as much as three-quarters of an inch and there must have been considerable bleeding as the large type sponge was used and there was some tying of blood vessels. Immediately after the opera-

.tion, plaintiff commenced having difficulties with her throat and continuously for a year and a half thereafter at intervals of from three to four weeks she was returning to defendant's office complaining about a sore throat and explaining to the defendant or his nurse that it felt like a lump was in her throat. Over a period of three years following the operation, plaintiff consulted with and received advice from twelve doctors or dentists in an attempt to get relief. She requested her remaining teeth to be pulled to remove any possible cause from that source. During that period and prior to the tonsillectomy, no gauze or sponge was inserted in her throat. Members of the medical profession observed the ulcers and concluded plaintiff was suffering from some physical disorder of the throat and mouth and some were of the opinion that cancer might be the cause. Plaintiff consulted experts on that disease and she was referred to Dr. Dolowitz to determine its presence. She submitted to two biopsies for that determination. No one had ever used any sponges, gauze or surgical materials in her mouth besides the defendant and the material exuded from the ulcers came from a sponge similar in type to the one used by the defendant. The defendant used catgut to tie some of the vessels and what appeared to be a piece of that type of tying material was found in the discharge. Four lay witnesses and one medical expert testified to gauze or threads being embedded in plaintiff's throat in, around, and about the fossa area. The materials were exuded or extracted from the ulcerated areas and were subjected to scientific analysis and proven to be parts of gauze or sponges. Over the period involved, plaintiff's acts and conduct were entirely consistent with her claim that immediately following the operation a lump developed in her throat, it became sore and continued that way until the foreign materials were removed.

Without question, the evidence will support the verdict unless, because of the medical testimony the jury is com-

pelled to find that parts of any gauze, sponge or threads were not left on the fossa and that if the ulcers were outside that area migration was impossible. The testimony of the medical experts, with the exception of one, was to the effect that materials could not migrate from the fossa to the area of the ulcers. Even were we to assume that there was no evidence that any sponge material or threads were taken from the fossa, and that to reach the places where they were found migration was required, the jury was not bound to find that such a migration was impossible. There was testimony by Dr. Dolowitz that strange things happen and that it was possible for migration to take place laterally. A somewhat similar principle was involved in the case of *Winchester* v. *Chabut,* supra. In that case, plaintiff claimed the defendant left a cotton gauze surgical sponge in the incision when the wound was closed by sutures. There was no direct evidence establishing the leaving of the sponge in the wound and the medical testimony was that expulsion could not happen as claimed by the plaintiff. The court there made the following statement on a jury question of fact, 32 N. W. 2d at page 360:

"* * * Defendant insists that the extrusion of several pieces of cotton gauze from different abscesses is not evidence from which it may be inferred that a gauze sponge was left in the wound because testimony of doctors sworn for the defense was that the physical reaction and natural processes in extruding such sponge, consisting of one piece of gauze about 15 inches square and folded and refolded into a 3-inch square, would be to encapsulate it and extrude it in one mass at one opening and that nature in this process does not unfold, separate and twist it in strands and extrude them separately in various places in the manner in which extrusion of gauze is alleged to have occurred in this case. However, the testimony of one of defendant's expert witnesses was that it might conceivably be erupted through one or more abscesses. There was thus a question of fact for the jury and testimony from which an inference might legitimately be drawn that the extrusion of bits of gauze from the several abscesses was occasioned by leaving a gauze sponge in the wound at the time of the operation. * * *"

Here the testimony of the expert was that lateral migration might conceivably take place. This made a question of fact for the jury and testimony from which an

inference might legitimately be drawn that bits of gauze and threads found in the ulcers was occasioned by leaving a part of a surgical sponge in the tonsil fossa.

The next question presents the problem of whether the evidence precludes a finding that the gauze or threads could have remained in the tonsil cavity. The medical evidence would require a finding that such was not possible, but we believe the other facts and circumstances permit a finding to the contrary. The evidence unquestionably shows that strings and gauze were embedded in the ulcers and they had to get in the throat in some manner. The jury could, from the evidence, exclude every possibility except that the defendant placed them there. Plaintiff's evidence showed that defendant was the only one who could have been responsible for the presence of foreign material in the ulcerated area. The medical testimony was based on the premise that the operation was performed in the usual manner and there was no cutting and suturing of the area surrounding the tonsil. True, the defendant testified that it was an ordinary operation, but the jury was not required to believe his evidence in its entirety. He used gauze material and catgut and it may have been in the use of the latter that the former was held in place. He admitted making an incision with the patella and the cutting may have been deeper than necessary in a usual operation. His evidence of the manner in which he performed the operation is at variance with the evidence of the doctors that foreign materials would not remain in the area under normal circumstances, coupled with the facts and circumstances following the operation and the evidence that foreign materials were found at or near the site of the operation. Considering plaintiff's evidence, defendant alone could have placed them there. In almost every malpractice case of this type, there is medical evidence which casts doubt on the cause of the injury, yet the other facts and circumstances may point rather clearly to the cause.

This merely results in a conflict in the evidence, to be reconciled by the jury.

The Supreme Court of Oregon in a similar case, *Carruthers* v. *Phillips*, 1942, 169 Or. 636, 131 P. 2d 193, 195, stated its holding in the following language:

"The defendant's testimony is that he did not cut the bladder and never inserted any gauze into the bladder and, of course, never left any therein. If the jury accepted his evidence, he was entitled to a verdict, but that is beside the point. The plaintiff's evidence showed that the bladder was exposed, a new bladder wall built up, cutting was done, gauze sponges were used, and a gauze sponge was removed twenty-one months later. Plaintiff was entitled to show that the defendant had opportunity to do the act charged. This she did show. She was entitled to go further and show that the defendant was the only one who could have done the act charged. This, too, she supported by her testimony. If the jury believed the evidence which she introduced, it was entitled to find that the defendant had inserted the gauze in her bladder and permitted it to remain there. When the doing of an act by the defendant is charged, evidence is admissible to show that the defendant had opportunity to do it, even though his opportunity be not shown to be exclusive, but: 'Since the showing of Opportunity leaves open all the hypotheses of other persons' equal opportunity, it is proper for the proponent of the evidence to strengthen it by cutting off, so far as possible these other hypotheses, i. e. by showing that the person charged was one of a few only, or the sole person, having the opportunity. In other words, while the proponent need not, he may always show exclusive opportunity.' 1 *Wigmore on Evidence*, 2nd Ed., § 131. In the case at bar the evidence for the plaintiff, if believed, was sufficient to warrant the jury in finding that gauze was placed and remained in plaintiff's bladder and that the defendant had opportunity and was the only one who did have opportunity to place it there and therefore that the defendant did the act charged. See *Moore* v. *Ivey*, Tex. Civ. App., 264 S. W. 283."

Defendant raises two other assignments of error which require scant attention. They are that the trial court erred in not permitting counsel for the defendant to cross-examine Dr. Dolowitz on migration. The court sustained an objection of improper cross-examination ■ because the matter had not been gone into on direct examination. We need not pass on whether or not the court erred in sustaining this objection as the doctor was recalled as a witness and testified fully on that subject. This would cure the error, if any, in the original ruling .

The judgment is affirmed, costs to respondent.

WADE, McDONOUGH, and CROCKETT, JJ., concur.

WOLFE, C. J., having disqualified himself, did not participate herein.