400 P.2d 209

Marion W. MALMSTROM, Plaintiff and Appellant,

v.

Theron C. OLSEN, Defendant and Respondent.

No. 10110.

Supreme Court of Utah.

March 19, 1965.

concerned.   See also Jopes v. Salt Lake County, 9 Utah 2d 297, 343 P.2d 728 (1959).

Richards, Bird & Hart, Salt Lake City, for appellant.

Hanson & Baldwin, Rex J. Hanson, Salt Lake City, for respondent.

WADE, Justice:

The plaintiff, Mrs. Malmstrom, appeals from a nonsuit judgment after she had submitted her evidence to the court and jury. She claims damages from defendant, Dr. Olsen, respondent here, a licensed chiropractor, for negligent malpractice in violently jerking her neck and head in giving treatments for low back pains in her spine, and thereby rupturing the fifth and sixth cervical discs in her neck. The nonsuit was granted for lack of expert testimony that Dr. Olsen failed to comply with the recognized standards of skill and care for chiropractic treatments here.

In Fredrickson v. Maw,[1] we said, "* * * in those cases which depend upon knowledge of the scientific effect of medicine, the results of surgery, or whether the attending physician exercised the ordinary care, skill and knowledge required of doctors in the community which he serves, must ordinarily be established by the testimony of physicians and surgeons." However, "* * * when facts may be ascertained by the ordinary use of the senses of lay witnesses, it is not necessary that expert

1. Fredrickson v. Maw, 119 Utah 385, 227 P.2d 772.

testimony be produced * * *." This is the recognized rule in this state[2] and applies to chiropractors and others treating human ailments[3] as well as physicians and surgeons.

In the Fredrickson case the proof indicated that the doctor in closing a tonsillectomy incision failed to remove gauze and other operation materials. There, we held that expert testimony was unnecessary to show negligent malpractice, because lay people as well as experts know that the medical standards of care were violated.

■ Here, we have two problems: 1) Does the evidence reasonably support a finding that Dr. Olsen so violently jerked plaintiff's head and neck in treating her for low back pains that he ruptured her fifth and sixth cervical discs? 2) Does such evidence reasonably support a finding of negligent malpractice without expert testimony that such a violent jerk ruptured the discs and is not the standard of chiropractic treatment in this vicinity? We reverse a nonsuit judgment if there is a reasonable basis in the evidence and the inferences therefrom when considered in the light most favorable to the losing party for a judgment in her favor.[4]

■ 1) The evidence reasonably supports a finding that the violent jerk by Dr. Olsen of plaintiff's head and neck ruptured her fifth and sixth cervical discs, thereby causing the injuries complained of. Following is a review of plaintiff's evidence.

On Sunday, June 11, 1961, Mrs. Malmstrom, accompanied by her husband, was treated by Dr. Olsen for low back pains which had bothered her for a number of years. However, she had suffered no previous pains in her neck. She disclosed these facts to Dr. Olsen and told him that he was recommended by Dr. Poulter, an Ogden chiropractor who had previously treated her and taken x-rays which he would make available to Dr. Olsen. Olsen thereupon stated he would call Dr. Poulter.

Dr. Olsen placed her on her abdomen, turned her head to one side and felt her spine. He then, with both hands on her head and neck, very violently and roughly gave her a jerk, causing severe pains in her neck; and she shouted, "ouch." After making an appointment for the next day, she and her husband left. She continued to suffer with very severe pains in her neck, more violent and severe than she had ever had before. On the road home she disclosed the severe pains to her husband. The next day when they visited Dr. Olsen, her husband told Dr. Olsen of the severe pains he had caused her; and Dr. Olsen said, "I can

2. Walkenhorst v. Kesler, 92 Utah 312, 67 P.2d 654.
3. Anderson v. Nixon, 104 Utah 262, 139 P. 2d 216.
4. Kitchen v. Kitchen, 83 Utah 370, 28 P. 2d 180; Martin v. Stevens, 121 Utah 484, 243 P.2d 747; Winegar v. Slim Olson, 122 Utah 487, 252 P.2d 205.

fix that." He then again placed her on her abdomen and again severely jerked her head and neck, causing almost unendurable pain. Thereafter they agreed to return for further treatments the next Wednesday. They did not keep this last appointment because of her severe pain.

Mrs. Malmstrom claims that she had received chiropractic treatments for these low back pains from Dr. Poulter of Ogden and Dr. Kesler of Salt Lake City, and a California chiropractor, but none of them jerked her head nearly so violently as Dr. Olsen; and she suffered no pains from other treatments. She also testified that prior to Dr. Olsen's treatments she had never had any such pains in her neck.

The next Friday, after the Olsen treatments, plaintiff with her husband left in their car on a trip to San Francisco. She was still suffering severe pains in her neck, and she could not drive the car more than 15 minutes at a time. It was very hard to get comfort either sitting up or lying down, and sleep was very difficult. They returned from San Francisco in about nine days.

On their return the pains were getting worse and were going into her arms and hands. She consulted their family physician, and he treated her for three days, July 10, 11 and 12, 1961, with a diathermy machine; but things continued to get worse, so the family physician called Dr. Bauman, an orthopedic specialist who deals with joints and bones. She visited him that day at his office. He first gave her pills and a cervical collar and had her sleep in traction with a weight pulling on her head. He then sent her to the L.D.S. Hospital for seven days. But her pains continued to get worse. She could hardly use her arms or hands, so that her daughter had to comb her hair. It was very difficult for plaintiff to do her work at the L.D.S. Hospital, where she was employed as a surgery nurse. She then went home for a couple of days, and then, on Dr. Bauman's suggestion, she consulted Dr. Bernson, a neurosurgeon, who examined her and sent her back to the L.D.S. Hospital.

At the hospital she was embarrassed and hesitated to tell Dr. Bauman and Dr. Bernson and the other people at the hospital about the chiropractic treatments. When she told the doctors, they advised her that she need not mention these treatments to other people or the intern who examined her. So her hospital record makes no mention of such treatments, but states that she knew of no slip or jerk in her neck.

At the hospital Dr. Bernson and Dr. Bauman studied her condition, took x-ray discograms of her neck, which means they inserted dye in the discs to cause them to show on the x-rays. They determined that the fifth and sixth cervical discs were ruptured. Two days later they operated on these discs, removing the ruptured parts and ingrafting bones. Thereafter, at first she improved

and then she got worse. Another operation was made on March 12, 1962, replacing one of the previously replaced bones which had failed to fuse. Since then she is greatly improved. She can raise her arms, comb her hair and do her work at the hospital and at home without pain. She resumed her job at the L.D.S. Hospital on July 23, 1962, where she has continued to be employed.

Both Dr. Bernson and Dr. Bauman gave their opinion, based on her case history that she had no previous neck pains, and their observations of the ruptured discs that these ruptures were of recent origin, and that they were caused by the violent jerks of her head and neck by Dr. Olsen. However, the court refused to allow these doctors to give their opinion on whether Dr. Olsen's treatments violated the chiropractic standards of care in this vicinity, because they are not qualified chiropractors. The evidence does definitely show that she had no previous pain in her neck or the cervical joints thereof; that the pains were in her lower back; that she had previously had chiropractic treatments for such pains, but none of the previous chiropractic treatments had hurt her neck. Also, her testimony was that Dr. Olsen's treatments consisted of much more violent and severe jerks of her neck and head than the other chiropractic treatments she had taken, and that the pains immediately produced were very severe and constantly got worse until after the operations. From this evidence a jury could reasonably find that Dr. Olsen had so violently jerked her head and neck as to cause the ruptures in her cervical discs.

■ 2) The evidence would reasonably support a finding of negligent malpractice against Dr. Olsen, in that this violent rupturing jerk violated the standards of chiropractic care in this vicinity.

Here, as in the Fredrickson case, any lay person would know without expert testimony that a chiropractor who so violently jerked his patient's head and neck, which had prior thereto been without pain, as to cause a rupture of the cervical discs and almost completely incapacitate her in a short time would not be using the standards of care required for chiropractors in this vicinity. This is especially true in view of the fact that for a number of years the plaintiff had been taking chiropractic treatments from other chiropractors, but none of them had had any trouble in avoiding rupturing her cervical discs. Such a showing would reasonably support a finding that the violent jerks by Dr. Olsen of plaintiff's neck caused ruptures of her cervical discs and was negligent malpractice in violation of the chiropractic standards here. This is so because the ordinary lay person could conclude that this violent jerk if it ruptured the cervical discs would be a violation of

the chiropractic standards.[5] The judgment of nonsuit is reversed with directions that a new trial be granted and the case be submitted to the jury for the determination of all material issues of fact. Costs to appellant.

McDONOUGH and CROCKETT, JJ., concur.

CALLISTER, Justice (dissenting):

The majority opinion is correct in concluding that, under the evidence, a jury could reasonably find that the defendant "violently jerked" plaintiff's neck, and that such "jerking" ruptured the cervical discs. However, a jury, without proper expert testimony, could not reasonably find that the defendant was negligent in his treatment.

This court has previously held that ordinarily a plaintiff, in a malpractice suit, must prove by expert testimony that the defendant practitioner failed to exercise such care and diligence as is ordinarily exercised by skilled practitioners (in the same field) doing the same type of work in the vicinity, and that the want or failure of the required skill and care was the cause of the injury.[1]

There is, however, an exception to the foregoing rule which this court recognizes and has applied in at least one case.[2] This exception is that no expert evidence is necessary where the practitioner's want of skill or care has been such as to be within the comprehension of lay persons and to require only common knowledge and experience to understand and judge it.

The determining question in the instant case is whether it falls within the general rule or the exception. It is my opinion that it falls within the former.

A chiropractor as well as a physician is not a warrantor of a cure or an insurer of a successful result. In Marsh v. Pemberton,[3] there was no doubt that the plaintiff-patient suffered severe injury to his leg because of a tight cast applied by the defendant physician. However, we held that, in the absence of proper expert testimony, the matter of negligence could not be submitted to the jury. The same reasoning applied in Pemberton is applicable here.

5. See cases cited in Notes 1, 2 and 3, supra, and Farrah v. Patton, 99 Colo. 41, 59 P.2d 76 (1936), a case very similar to this one. See also 81 A.L.R.2d 597, Annotation Necessity of Expert Evidence.
1. e. g., Baxter v. Snow, 78 Utah 217, 2 P.2d 257 (1931); Edwards v. Clark, 96 Utah 121, 83 P.2d 1021, rehearing denied, 96 Utah 140, 85 P.2d 768 (1938); Forrest v. Eason, 123 Utah 610, 261 P.

2d 178 (1953); Marsh v. Pemberton, 10 Utah 2d 40, 347 P.2d 1108 (1959).
2. Fredrickson v. Maw, 119 Utah 385, 227 P.2d 523 (1957), which is discussed in the main opinion. Walkenhorst v. Kesler, 92 Utah 312, 67 P.2d 654 (1937), cited in main opinion, is not in point. There, a chiropractor stepped out of his field and diagnosed as a physician.
3. Supra, note 1.

The mere fact that the defendant jerked the plaintiff's neck resulting in ruptured cervical discs does not necessarily mean that the defendant departed from standard chiropractic standards. The judgment of the lower court should be affirmed.

HENRIOD, Chief Justice (dissenting):

I dissent, and in doing so concur in the dissenting opinion of Mr. Justice Callister.

The main opinion concedes everything that Mr. Justice Callister asserts, but overrides the trial court's conclusion, which many times we have said is invulnerable to reversal on appeal unless he was capricious. I do not think the trial court was capricious here, but correctly applied established legal principles.

The main opinion places the stamp of incompetence on a chiropractor by innuendo and conjecture, without competent evidence. It arrives at its result by reciting what was said by a couple of doctors, which recitation seems to have been unnecessary. It concedes it to be inadmissible as expert testimony, but says that discounting it nonetheless the interested plaintiff and the lady next door and up the street, if asked to testify, would testify that if a chiropractor manipulates a torso in a particular fashion he is tortious, if unhappy results evolve, and that such testimony would be competent.

The case upon which the main opinion relies, Fredrickson v. Maw, conceded the general rule, but based its decision on an exception to the rule requiring that expert testimony is essential to establish tortious compensability in fields of science. The court said in that case that compensability was justified only because the doctor "carelessly left gauze dressings, threads and sutures in the tonsil cavity." In the next paragraph it defended such conclusion by emphasizing the exception to the general rule. Such exception says doctors are negligent, without expert testimony, if it is demonstrated that they left "instruments, needles, sponges, bandages, gauze or foreign particles in incisions, wounds, or open cavities." It could have included dynamite, or a bar of Lifebuoy soap.

The factual dissonance between that case and this is so ear-piercing as to induce jurisprudential deafness. In that case, of course, including the lowly midwife, anyone would conclude that leaving flotsam and jetsam in the sewed-up innards of a trusting patient would not merit a kudos at the medical college. Not even a flunked premed student would or could attest to the proposition that expert testimony would be necessary to conclude that leaving sponges and knives and other sundry knick-knacks in the throat, or elsewhere, was not standard chiropractice in the community.

In this case it is conceded 1) that the doctor's testimony was not expert testi-

mony; 2) that the plaintiff may have suffered ill effects from manipulation of her spine by a licensed practitioner doing what he thought was best to do; 3) that no expert testified that his treatment was abortive or unusual in his field—and that is all.

The net result is that this whole decision is a guess and speculation as to what the unlearned man on the street would conclude, given the facts of this case. I would venture a guess that a vast majority would not conclude that the chiropractor failed to do what other chiropractors in the community would do under the facts here. Even if they concluded otherwise, it would not change the rule of evidence. Otherwise we were dead wrong in Forrest v. Eason and Marsh v. Pemberton, cited by Mr. Justice Callister, both of which were decided by unanimous vote of this court.

In my opinion this case destroys the other two, where stronger facts would have justified the conclusion of the main opinion here.

The trial court was correct in entering a non-suit for plaintiff's complete failure to present expert testimony to the effect that the chiropractor's manipulation of the spine was not in accordance with accepted methods of treatment by members of his profession in the community. *This was the sole question in this case,* and there is no evidence whatever that others would have done otherwise. The main opinion seems to look not to evidence and rules applicable thereto, but only to results, and to "instruments, needles, sponges, bandages, gauze or foreign particles (left) in incisions, wounds or cavities." This puts the scalpel to a judicial incision to the well-established rule of evidence mentioned, suturing it with legal thread, after which the evidentiary instruments, needles, sponges, etc. are left to fester the legal wound.

The trial court should be affirmed.