442 P.2d 944

**Myrtle K. DENNEY, Plaintiff and Appellant,**

v.

**ST. MARK'S HOSPITAL, a Utah corporation, Defendant and Respondent.**

No. 11065.

Supreme Court of Utah.

June 21, 1968.

Rawlings, Roberts & Black, John L. Black, Salt Lake City, for plaintiff and appellant.

Worsley, Snow & Christensen, John H. Snow, Salt Lake City, for defendant and respondent.

ELLETT, Justice:

This is an appeal from a directed verdict in favor of defendant. The appellant will be referred to by name or as plaintiff, while respondent will be referred to by name or as defendant.

The plaintiff had been hospitalized many times in the St. Mark's Hospital. On or about January 20, 1962, she had been operated on for the repair of a rectocele and some 10 days later was to be released from the hospital. A doctor not connected with the rectocele operation but who had performed two operations on her spine some time prior thereto wanted some x-rays taken of plaintiff's lumbar spine so that the costs thereof would be covered by her insurance policy. Accordingly, she was taken to the x-ray room, where the defen-

dant's employee, an x-ray technician, took several x-rays of her spine.

Plaintiff's claim against the defendant is based upon her own testimony and that of Dr. Hebertson, who treated her some four months later. At the trial plaintiff testified regarding the cause of her injury as follows:

A. * * * And he [the x-ray technician] asked me to put my head and knees down as far as I could and he took the back of my neck and underneath my knees this way (indicating) and he pushed and it caused the awful feeling in the back of my head, and I told him that I was afraid he had hurt me—I have to go back just a little bit. I told him to be careful with my neck because I had had just a short time since then been operated on and I didn't want it hurt, but he pushed my neck and knees together much, much too far because he hurt the back of my head in some way.

Q. Will you tell us what you felt?

A. Well, it felt—the only thing that I can tell you, and make it clear, is that it felt like an electric shock in the back of my neck.

Plaintiff claims that she told her husband the evening following the taking of the x-rays that she believed "they hurt my neck," but her husband was not called as a witness. She also claims that she told a nurse that same night that her neck was hurt. However, the nurse she claims to have told worked the day shift and was not in the hospital at all during the night. The plaintiff never complained to her doctor, and no mention was made in the hospital chart of any complaint about an injured neck. The hospital chart does not show that she required or took any different type of pain killer during 36 hours following her alleged injury than she had been taking for the 10 days prior thereto.

Two days after the x-rays were taken, plaintiff suffered a stroke and was treated by Dr. Wright, a neurosurgeon, for that affliction. She never told him about any trouble in the x-ray room, although he treated her from February 2 to the latter part of May, 1962.

Thereafter, on June 5, 1962, she became a patient of Dr. Hebertson, a neurologist, who questioned her carefully to determine the cause of her complaints of headache and pain. She did not tell him about any problem in the x-ray room until after he had placed her in the hospital June 17, 1962. Some time thereafter she told Dr. Hebertson that her neck had been forced forward while x-rays were taken of her spine.

The complaints made by the plaintiff have been numerous and varied. She claims that she had pains in the back of her head and neck, down the side of her face and right side of her body, in her back and arms, and that she felt numb in

her foot, knee, ankle, and hips; that she lost one-half of her vision in each eye and lost the use of her right hand and arm. At the time of trial she described her complaints then existing as follows:

> Well, right now the side of my face is numb and my ear feels very large. My arm, my entire arm right at the moment is numb from my shoulder down to into my fingers. My knee and my ankle are numb and the pain is terrific in the back of my neck.

On direct examination Dr. Hebertson testified regarding the force used by the x-ray technician as related to him by the plaintiff as follows: "This type of maneuver could cause this type of difficulty with disc, yes." It is obvious that at the time of his diagnosis Dr. Hebertson thought plaintiff had a herniated or slipped disc in the cervical spine between the fifth and sixth vertebrae and the sixth and seventh vertebrae. However, later in June of that year two other doctors operated on the cervical spine of the plaintiff but found no disc problem at all. In fact, there had been a fusion made of these two joints and the disc material removed some time prior to the taking of the x-ray pictures. The doctors performing this operation on plaintiff's cervical spine removed some spinous processes which were impinging on a lateral nerve, and plaintiff was afforded some relief from her complaints of pain. Later she was beset by the old symptoms and was re-admitted to the St. Mark's Hospital in March, 1963, to have surgery on her right wrist. Twice more in 1963 she was hospitalized for observation and conservative medical care and treatment. In June of 1964 she went to the St. Mark's Hospital again for further operation on the cervical vertebrae, wherein disc material was removed and another fusion performed. In September, 1964 she was placed in the same hospital again. This time she had a nerve in the neck severed in order to relieve pain in her right arm and hand. Again in November, 1964, she was hospitalized for physiotherapy to her neck and back.

It is not to be doubted that the plaintiff has suffered much from physical ailments. The defendant admits this. The questions which plaintiff raises on this appeal are these: Was the evidence presented of such a nature as to warrant a jury of reasonable men to find that the x-ray technician was negligent in the manner in which he handled the plaintiff? If so, was such negligence a proximate cause of the injuries complained of?

The law is clearly to the effect that if reasonable men can find by a preponderance of the evidence for plaintiff, it is error for a judge to withdraw the case from the consideration of the jury, and on appeal from a directed verdict we must review the evidence in the light most favorable to the losing party, to wit, to the

plaintiff in this case. However, this does not mean that we must ignore undisputed facts which may be favorable to the prevailing party. Toma v. Utah Power & Light Company, 12 Utah 2d 278, 365 P.2d 788. The only evidence of causation in this case is the statement of plaintiff that the x-ray technician "pushed my neck and knees together much, much too far because he hurt the back of my head in some way."

This court has on several occasions considered the quantum of evidence required to enable a plaintiff to go to the jury when the question of human ailments was involved. In the case of Fredrickson v. Maw, 119 Utah 385, 387, 227 P.2d 772 (1951), the doctor had left a sponge in the area of the throat where he had performed a tonsillectomy. This court said:

> The better-reasoned cases announce a rule of law to the effect that in those cases which depend upon knowledge of the scientific effect of medicine, the results of surgery, or whether the attending physician exercised the ordinary care, skill and knowledge required of doctors in the community which he serves, must ordinarily be established by the testimony of physicians and surgeons. There is, however, another well-recognized rule holding that when facts may be ascertained by the ordinary use of the senses of lay witnesses, it is not necessary that expert testimony be produced and relied upon.

The only facts in the instant case which may be ascertained by the ordinary use of the senses of a lay witness are that the technician moved plaintiff's body, and that the back of her head hurt. No lay witness can by the ordinary use of his senses say that the complaints of the plaintiff, including the hurting in the back of her head, were caused by this claimed adjustment of her position on the x-ray table. The feeling like an electric shock in the back of her neck is not so obvious to the lay witness as was the sponge working itself out of the tongue and throat of Mrs. Fredrickson.

The case of Malmstrom v. Olsen, 16 Utah 2d 316, 318, 400 P.2d 209 (1965) was a case where the defendant, a chiropractor, gave a violent jerk to plaintiff's head and neck, causing plaintiff to cry out in pain. The next day the defendant repeated the "treatment," causing almost unendurable pain to the patient. Surgeons operated and found ruptured discs which they testified were of recent origin and were caused by violent jerks to the plaintiff's head. This court there quoted the language from Fredrickson v. Maw as above set out and then said:

> This is the recognized rule in this state, and applies to chiropractors and others treating human ailments as well as physicians and surgeons.

In the instant case Dr. Hebertson testified that pressure such as plaintiff said the

technician applied to her neck could have caused the condition in her neck which he diagnosed early in June (a ruptured or slipped disc). However, the operation in the latter part of June showed no disc problem at all and only that a bony spur of the spinous processes was rubbing against a nerve. Such testimony is not sufficient to enable a jury to do more than speculate as to what was the cause of plaintiff's troubles. In fact, Dr. Hebertson gave the following testimony on cross examination:

Q. And when you told us that all of these problems that she had could have been caused—well, let's see. I believe you were asked that slightly a different way. I believe you were asked it—you said, I believe, in quoting you correctly, that the incident that later was described to you when she was in the St. Marks Hospital when she told you at that time in June about having had this thing happen back in January, you said that could cause this type of difficulty and other things equally could have caused it, isn't that true, Doctor?

A. Yes, that is true.

Q. You're not telling this Court and this jury that that's what did cause this with a reasonable medical probability, are you?

A. No.

Q. As a matter of fact, Doctor, you don't even know with a reasonable medi-cal probability that in the hospital as of January 30 or 31, 1962, that this lady had any neck injury so far as your determination is concerned, isn't that true?

A. From my personal knowledge, I do not.

Q. All you know is what you could detect or what the fellows working with you could detect in June of '62?

A. Yes.

Q. And the whole thing then, Doctor, as far as I think what you found June, '62, to what the lady says occurred in January of '62 rests upon her story of what happened, does it not?

A. Yes, sir, it does.

Q. And isn't it a fact, Doctor, finally that medical probabilities are based upon what I have shown you in this hospital chart of the findings as reported by the nurses' findings as reported by Dr. Mortensen, the findings as reported by Dr. Reese and the finding of that blockage of vision of the eye on the right field both eyes, isn't it a medical probability that she had a stroke when she was in the hospital and that's all?

A. Yes, sir.

In the case of Moore v. Denver & Rio Grande Western Railroad Co., 4 Utah 2d 255, 292 P.2d 849 (1956), this court reviewed some earlier decisions relating to

medical proof required to take a case to the jury. Those earlier decisions were compared with Chief Consolidated Mining Co. v. Salisbury, 61 Utah 66, 210 P. 929 (1922), and the court then said at pages 258–259 of the Utah Reports, 292 P.2d at page 851:

> * * *. The Salisbury case is very similar to the present case in that the doctor's testimony was that the accident "might have" or "could have" accelerated heart disease; there being no other evidence than this, the court held that an award based upon such speculative evidence must be annulled. * * *

> * * * Although the medical testimony indicated that the symptoms showed a nerve irritation, and that such symptoms were consistent with the existence of a disc injury, we cannot discover in the witness' words anything more than their corollary that, under the circumstances, a disc injury was not impossible. * * *

We think the trial court was correct in holding that any injury sustained by plaintiff was not shown by the evidence to be the result of any manipulation of her body by the x-ray technician.

The judgment of the trial court is affirmed. No costs are awarded.

CROCKETT, C. J., and TUCKETT, CALLISTER and HENRIOD, JJ., concur.