**Lea R. FICKLIN and Margaret Ficklin, his wife, Plaintiffs and Appellants,**

v.

**J. Ralph MACFARLANE, M.D., and J. R. Rees, M.D., Defendants and Respondents.**

**No. 14271.**

Supreme Court of Utah.

May 27, 1976.

---

Glenn J. Mecham of Mecham & Richards, Ogden, for plaintiffs and appellants.

Rex J. Hanson and John M. Chipman of Hanson, Wadsworth & Russon, Salt Lake City, for defendants and respondents.

HENRIOD, Chief Justice:

Appeal from the dismissal by the trial court of an action based on alleged malpractice for failure to establish a prima facie case. Affirmed with costs to defendants.

Mr. Ficklin, in April 1971, experiencing chest pains, consulted his family physician, who referred him to Dr. Jahsman, an internal medicine specialist, who diagnosed his ailment as heart disease with angina pectoris symptoms. He prescribed nitroglycerin treatment. After the chest pain incident, plaintiff was unable to return to work, his condition became worse, followed by a cardio infarction, for which he was hospitalized for ten days. Dr. Jahsman continued the treatment, when in September 1971, plaintiff's chest pain increased, with more fatigue. Dr. Jahsman suggested that plaintiff *consider* a rather new medical technique having to do with an artery bypass. Such an operation had not been conducted in plaintiff's home town of Ogden, but had been at Salt Lake City, about 35 miles to the south. A coronary arteriogram revealed a complete blockage of a coronary artery.

Dr. Jahsman discussed the risks of such surgery with plaintiffs and the alternatives thereof, also advising them that the operation had not been conducted before in Ogden. He warned that Mr. Ficklin might not survive the operation. He did not tell *plaintiff that there was a risk of damage* to the central nervous system (which the doctor may have considered inconsequential and unnecessary). At the trial it developed that such damage did occur in this case, but that the risk thereof was an extremely remote one, and less than one per cent. The doctor testified that he advised plaintiff that there was a difference of opinion in the medical profession as to the advisability of this type of operation and that there was a lot of national publicity, about it, and brought the matter up to find out if plaintiff was interested in it. He said *that it was a somewhat dangerous procedure, but did not list all the dangers.*

The plaintiff was aware that there may *be another heart attack and that it could* be fatal, but without an operation there would be continued disability in any event. After the arteriogram and at the suggestion of Dr. Jahsman who had been treating him, Mr. Ficklin consented to the operation and consented to consult with a thoracic physi- cian, *who could perform the operation.* Defendants were employed and it is con- ceded that the operation was performed by defendants, as a team, without negligence of any kind. It is also conceded that the only question is whether there was malprac- tice if *these* defendants had not informed plaintiffs as to all risks, including that of death, no matter how remote. Dr. Jahs- man had at considerable length warned Mr. Ficklin of the dangers and risks, and it is not unreasonable to conclude defendants knew the history of this case.

Before the operation, but after Dr. Jahsman had advised the Ficklins of the serious possibility of risk under the concededly dangerous operation, defendants told them what the surgical procedure would be, accompanied it by commenting and adding that there was a risk in any surgery. After the surgery, defendants learned that plaintiff had suffered a neurological defect reflected by seriously damaged vision amounting to almost blindness, an impaired speech and paralysis of Mr. Ficklin's left side. The defendants, and a neurologist called in for consultation, could not determine the cause of the central nervous system damage, but concluded that any number of things could have caused it.

Counsel for defendants candidly admits that a physician should consult his patients and advise them of possible complications, but he does not concede that as a matter of necessity he must advise as to ones that, in a physician's studied judgment very well might cause hesitation on the part of his patient and where, because of such hesitation, his illness most assuredly would be terminal, where an operation well might prevent such consequence,—which in a particular instance would be considered a good medical decision and practice in the community.

Counsel for plaintiffs admits that his thesis about the "informed consent doctrine" is, that a surgeon, to be free from malpractice liability, *must* advise his patient as to every material, conceivable risk. In so saying, he urges that no medical testimony therefore is admissible to establish malpractice under the so-called "informed consent doctrine,"—with which conclusion we disagree. That the doctrine is claimed to be some sort of modern trend, is simply a conclusion or departure not reflected generally in courts of last resort. This doctrine simply is the minority view. Almost all the authorities cited by plaintiffs are those of intermediate appellate courts,[1] and even some of those do not support plaintiffs' thesis but simply suggest the principle that a physician may be derelict if he does not advise his patient reasonably of possible risks, not *all* of them. On careful analysis, most of those cases, including his cases in courts of last resort, do not reject the principle that in medical malpractice cases, expert testimony is admissible to show or reject negligence based on accepted standards in the community. *Ze Barth v. Swedish Hospital*, 81 Wash.2d 12, 499 P.2d 1, 52 A.L.R.3d 1067, cited with approval by plaintiffs, actually espouses this established rule. Others cited either expressly or impliedly adhere to such principle, and the A.L.R. reference above concedes this to be the case.

The one case apparently supporting plaintiffs' contention is *Cooper v. Roberts* (footnote 1), which also is only an intermediate appellate court. It concluded that expert testimony concerning malpractice under the "informed consent doctrine," was not admissible and compensability was allowable even where the percentage of risk of injury was .0004 per cent,—so that in that case if the physician told his patient of 9,996 possible risks but neglected or forgot to tell him of four possible, and perhaps infinitesimally, minor ailments, he would be liable in damages. We think this is unrealistic, rather time consuming, and a case to which this court cannot subscribe.

■ This court is committed to the principle that expert testimony is admissible in malpractice cases based on alleged negligent treatment below standards extant in medical circles.[2] This is the majority rule,

---

1. *Canterbury v. Spence*, 150 U.S.App.D.C. 263, 464 F.2d 772; *Fogal v. Genesee Hospital*, 41 A.D.2d 468, 344 N.Y.S.2d 552; *Salgo v. Stanford*, 154 Cal.App.2d 560, 317 P.2d 170; *Miller v. Kennedy*, 11 Wash.App. 272, 522 P.2d 852; *Emmett v. Eastern Dispensary*, 130 U.S.App.D.C. 50, 396 F.2d 931;

*Cooper v. Roberts*, 220 Pa.Super. 260, 286 A. 2d 647.

2. *Marsh v. Pemberton*, 10 Utah 2d 40, 347 P.2d 1108 (1959); *Malmstrom v. Olsen*, 16 Utah 2d 316, 400 P.2d 209 (1965); *Denny v. St. Marks Hosp.*, 21 Utah 2d 189, 442 P.2d 944 (1968), and cases therein cited.

as reflected in other cases.[3] We can see no logical reason why the same principle should not apply in malpractice cases based on a failure to inform a patient of the material, usual, but not highly speculative risks,—which procedure should be a part of a medical practitioner's duty,—the negligent failure to perform in violation of the accepted practices in medical circles in the community being compensable,—such standard treatment being no more, no less, than any other negligence, such as substandard suturing, or the classic leaving of a sponge in the body as a replacement for an appendix.

ELLETT and TUCKETT, JJ., concur.

MAUGHAN, J., concurs in the main opinion and also in the concurring opinion of CROCKETT, J.

CROCKETT, Justice (concurring specially):

I concur with the affirmance of the judgment. In doing so I add the following, which I think are sound and pertinent propositions:

First, that when a doctor consults with his patient relative to the latter's decision to undergo surgery, he has a duty to advise the patient, insofar as he can, of the risks reasonably to be anticipated;[1] second, that when a genuine dispute arises as to whether he has done so, both lay and expert testimony relevant to that issue are admissible.[2]

In applying the foregoing to the instant case, where the evidence is that the risk of the injury that resulted was only one in a hundred, it should be ruled as a matter of law that the doctor was guilty of no breach of duty. This because where the likelihood

of such a result was so minimal, reasonable minds could not fairly and reasonably conclude that this was an injury reasonably to be anticipated. Further, even if it be assumed that a doctor had failed to so advise, there would be some difficulty in such a situation concerning the problem of proximate cause, i. e., whether or not the patient would have consented anyway; and thus whether any deficiency in the advice could be found to be the proximate cause of the injury.

---

3. *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093; *Mallett v. Pirkey*, 171 Colo. 271, 466 P.2d 466 (1970); 52 A.L.R.3d 1067.

1. *ZeBarth v. Swedish Hospital Medical Center*, 81 Wash.2d 12, 499 P.2d 1, 52 A.L.R. 3d 1067; Prosser, Torts, Sec. 32 (4th Ed. 1971).

2. *Canterbury v. Spence*, 150 U.S.App.D.C. 263, 464 F.2d 772, cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972).