1999 UT 103

**Terry FITZ, Plaintiff, Appellee,
and Cross–Appellant,**

v.

**SYNTHES (USA), Defendant, Appellant,
and Cross–Appellee.**

No. 980106.

Supreme Court of Utah.

Nov. 5, 1999.

Barry G. Lawrence, James E. Magleby, Salt Lake City, for plaintiff.

Ray R. Christensen, Salt Lake City, and Denise Bense, Philadelphia, for defendant.

HOWE, Chief Justice:

¶1 Plaintiff Terry Fitz brought this action against defendant Synthes USA (hereafter "Synthes"), seeking compensatory and punitive damages allegedly caused by the breakage of bone screws manufactured by Synthes that had been surgically implanted in his lower spine. Fitz's complaint alleged negligence, strict liability in tort, breach of express and implied warranties, and failure to warn. At trial, a jury returned a special verdict in favor of Fitz in the amount of $70,609 on the implied warranty claim only. Synthes now appeals the judgment entered on that verdict contending that Fitz failed to prove the essential elements of that claim.

## BACKGROUND

¶2 In November 1989, Fitz injured his back in an industrial accident. The injury was diagnosed as a herniated disc and surgery was recommended. In January, 1990, Dr. Robert Berry performed a laminectomy[1] on Fitz. During surgery, Dr. Berry discovered that Fitz suffered from a congenital disintegration of the vertebra known as spondylolysis. Thereafter, Dr. Berry recommended a second surgery to repair Fitz's spine.

¶3 In August 1990, Fitz underwent a spinal fusion which included two disc spaces in his lower back at the L–4, L–5, and S–1 vertebrae. The surgery included the implantation of dynamic compression plates which were attached to Fitz's vertebrae by cancellous bone screws manufactured by Synthes. The plates and screws were implanted to stabilize the vertebrae, thereby increasing the probability of fusion.

¶4 By October 1990, some fusion had taken place, but the plates and screws had begun to loosen. In March 1991, an x-ray showed that screws at the L–4 vertebra had broken and that the vertebrae had not fused. In response, Dr. Berry recommended that Fitz undergo a third surgery—to remove the Synthes hardware and implant a different brand and type of plate. In November 1991, Fitz underwent the third surgery, and Dr. John D. Schlegel successfully removed the

Synthes plates and screws and implanted another type of plate in Fitz's back. With the new plate in place, the vertebrae successfully fused.

¶5 Fitz brought this action against Synthes alleging negligence, strict liability in tort, breach of express and implied warranties, and failure to warn. He sought both compensatory and punitive damages. Fitz's allegations stemmed from the breakage of the Synthes screws, lack of spinal fusion following the second surgery, and the need for a third surgery to remove and replace the Synthes hardware. At trial, following the conclusion of Fitz's case in chief, Synthes moved for a directed verdict. The trial court responded by dismissing the claims for failure to warn and for punitive damages due to insufficient evidence. The court denied Synthes' motion on the other three causes of action. At the conclusion of the presentation of all the evidence, Synthes moved for a directed verdict contending that the evidence was insufficient to allow the case to go the jury. This motion was denied.

¶6 The case was submitted to the jury on the issues of negligence, strict liability in tort, and breach of express and implied warranties. The jury concluded that Synthes was not liable on the issues of negligence or strict liability but entered a verdict in favor of Fitz on the issue of breach of implied warranty. Fitz was awarded $58,578 in special damages and $12,131 in general damages. Thereafter, Synthes moved for judgment notwithstanding the verdict (JNOV) contending that Fitz failed to prove the essential elements of a breach of implied warranty. The motion was denied and this appeal followed.

## ANALYSIS

### I. INSUFFICIENT EVIDENCE

¶7 Synthes contends that the trial court erred by denying its motions for a directed verdict and JNOV on the issue of breach of implied warranty. It argues that Fitz failed to present evidence to warrant giving the case to the jury.

---

1. A laminectomy is the "surgical excision of the posterior arch—the curved part—of a vertebra." Bernard S. Maloy, M.D., *Medical Dictionary for Lawyers* 434 (3d ed.1960).

¶ 8   On appeal, this court reviews the evidence presented at trial in the light most favorable to the prevailing party and will reverse a trial court's decision only if the evidence is insufficient to support the verdict. Moreover, the appealing party has the burden of marshaling the evidence in support of the verdict and then showing that it is insufficient. *See Tingey v. Christensen*, 987 P.2d 588, 590 (Utah 1999); *Scudder v. Kennecott Copper Corp.* 886 P.2d 48, 52 (Utah 1994); *Heslop v. Bank of Utah*, 839 P.2d 828, 839 (Utah 1992); *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 799 (Utah 1991).

¶ 9   Synthes argues that Fitz failed to adduce evidence to prove the essential elements of a breach of implied warranty of fitness for purpose.   Under Utah law, an implied warranty of fitness for purpose is established,

[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Utah Code Ann. § 70A–2–315.   A breach occurs where a plaintiff has shown:

(1) that he or she made known to the seller the purpose for which the article was purchased;  (2) that the purchaser relied on the seller's skill and judgment;  (3) that there was some defect in the article sold that rendered it unfit for the purpose;  (4) proximate cause;  and (5) damages.

63 Am.Jur.2d 586 *Products Liability* § 724 (1996) (footnotes omitted).   Synthes asserts that the evidence was insufficient to support the jury's finding that a breach had occurred. Specifically, it argues that the evidence failed to prove proximate cause, defect, and reliance.

## II.   MEDICAL CAUSATION

¶ 10   Synthes contends that Fitz presented no evidence that the screw breakage caused the spinal fusion to fail.   It argues that proximate cause is an essential element of Fitz's breach of warranty of fitness for purpose claim and that its motion for a directed verdict should have been granted.   To determine whether Synthes is correct, we examine the law of medical causation.

¶ 11   This court has held that medical expert testimony is required to prove proximate cause in a medical injury case.   In *Fredrickson v. Maw*, 119 Utah 385, 387, 227 P.2d 772, 773 (1951), we stated:

in those cases which depend upon knowledge of the scientific effect of medicine, the results of surgery, or whether the attending physician exercised the ordinary care, skill and knowledge required of doctors in the community which he serves, must ordinarily be established by the testimony of physicians and surgeons.

*Accord Denney v. St. Mark's Hosp.*, 21 Utah 2d 189, 192, 442 P.2d 944, 946 (1968).   *See also Huggins v. Hicken*, 6 Utah 2d 233, 238, 310 P.2d 523, 526 (Utah 1957) (setting aside verdict after plaintiff failed to provide medical expert testimony proving causation of medical injuries);  *Moore v. Denver & Rio Grande Western Railroad Co.*, 4 Utah 2d 255, 292 P.2d 849 (Utah 1956) (holding evidence of medical causation insufficient to give case to jury).

¶ 12   When the evidence is viewed in the light most favorable to Fitz, there is a lack of medical causation evidence.   Fitz relied upon the testimony of Dr. Harold Alexander, a biomedical engineering expert with degrees in aeronautical engineering and applied mechanics, and Dr. Robert Berry.   Dr. Alexander provided a great deal of evidence regarding the design, creation, and application of various plates, screws, and other biomechanical devices which are manufactured for implantation in the human body.   He testified that the Synthes screws implanted in Fitz's back were designed for the long bones in the arm or leg and are more likely to break when implanted in vertebrae than when implanted in the long bones.   Dr. Alexander also testified that because the lower spine is a high stress area of the body, there is an increased chance of screw breakage, and that when someone has undergone spinal fusion surgery, the stress is concentrated in the area surrounding the implanted hardware.   He testified about many other biomechanical

matters relating to spinal implants, but the trial court would not allow him to testify about medical causation. Moreover, the court specifically precluded him from giving his opinion as to whether the Synthes screw breakage caused Fitz's spinal fusion to fail.

¶ 13 Dr. Berry testified that Fitz was healing satisfactorily before the Synthes screws broke, and that prior to the screw breakage he believed the fusion would be a success. Dr. Berry stated that once he discovered that the screws had broken, he believed that fusion would not likely be achieved. Fitz relies on this testimony to support his assertion that the broken Synthes screws caused Fitz's fusion to fail, necessitating the third surgery. However, on the issue of causation, Dr. Berry stated that a failed fusion is typically the cause of screw breakage and that broken screws do not cause a failed fusion.

¶ 14 The only evidence of medical causation Fitz presented came from a letter written to him by Dr. John D. Schlegel, the orthopedic surgeon who performed Fitz's third surgery.[2] Dr. Schlegel suffered a brain aneurysm prior to trial and was unable to testify. However, taken in context, the relevant portion of his letter reads:

> As you know, you had two operations by Dr. Robert Berry. Dr. Berry did a disc clean-out on the first operation. The second operation, apparently by the report I saw, found some slippage of the vertebrae. Because of that, he performed a fusion and used the [Synthes hardware]. As you know, the screws broke and that necessitated the third operation.

While the letter does seem to address medical causation, standing alone it is insufficient to establish that the screw breakage caused the lack of fusion. Without more, the letter could be interpreted as meaning that the screws broke, preventing fusion from occurring, and the third surgery became necessary. However, it could also be read to

mean fusion did not occur, which caused the screws to break, necessitating the third surgery.

¶ 15 Synthes, on the other hand, presented the testimony of Dr. Thalgott, a board certified orthopedic surgeon, and he also relied upon the testimony of Fitz's witness, Dr. Berry. The doctors each testified that, on average, fusion takes six months; however, they also testified that fusion can occur as early as three months but can take as long as eighteen months to two years. Fitz contends that because the Synthes' screws broke less than six months after they were implanted in his vertebrae, the screw breakage caused the fusion to fail. However, this contention clearly contradicts the evidence presented. Drs. Berry and Thalgott both testified that the screw breakage did not cause the fusion to fail, but rather the failed fusion caused the screws to break. Fitz did not present any evidence supporting his medical causation claim, and the trial court would not allow his medical engineering expert to give an opinion on medical causation. Thus, the testimony of Drs. Berry and Thalgott regarding causation went unchallenged.

¶ 16 In light of the foregoing, we conclude that because Fitz failed to present evidence of medical causation, the court erred in allowing the issue of breach of implied warranty for a particular purpose to go to the jury. Therefore, Synthes' motion for a directed verdict should have been granted on this issue.

### III. RELIANCE AND DEFECT

¶ 17 In addition to proving proximate cause, to establish a breach of implied warranty of fitness for purpose, a plaintiff must also show reliance, defect, and damages. However, because we have established that Fitz failed to provide evidence that the Synthes screw breakage proximately caused his fusion to fail—and thereby necessitated the third surgery—we need not address

---

2. Relying upon rule 11(h) of the Utah Rules of Appellate Procedure, Synthes filed a post-trial motion to remove the Schlegel letter from the record. Synthes argued that the letter was inadmissible hearsay and the trial court had a duty to remove it. The trial court granted Synthes' mo-

tion, and Fitz on cross-appeal now contends that the trial court erred by so doing. However, we find that in the context of this case the letter is of no consequence; therefore, we will not address the merits of Fitz's cross-appeal on this issue.

whether Fitz proved the additional elements required to prove a breach of implied warranty of fitness for purpose.

## IV. JURISDICTION

¶ 18  Following the entry of the trial court's judgment in favor of Fitz, Synthes filed a motion for JNOV. The trial court denied the motion and, within thirty days of the denial, Synthes filed a timely notice of appeal.  Thereafter, Synthes filed a motion to correct the record pursuant to rule 11(h) of the Utah Rules of Appellate Procedure. The motion was granted.

¶ 19  Fitz now contends on cross-appeal that this court lacks jurisdiction because Synthes failed to re-file its notice of appeal within thirty days after the trial court ruled on its motion to correct the record.  He contends that although the Synthes motion was styled by its caption as a motion to correct the record, it was in fact "a post-trial substantive evidentiary motion" and "the functional equivalent of a motion which, pursuant to Utah Rules of Appellate Procedure 4(b), deprives this court of jurisdiction."

¶ 20  Synthes responds that its motion to correct the record was made to prevent an improperly received trial exhibit from being considered as part of the record by the appellate courts.  It further argues that the motion was made to aid its appeal and not to seek any type of post-trial substantive relief from the trial court's final judgment on the merits.

¶ 21  We conclude that we have jurisdiction over Synthes' appeal.  Rule 4(b) of the Utah Rules of Appellate Procedure states:

> If a timely motion under the Utah Rules of Civil Procedure is filed in the trial court by any party [pursuant to Rules 50(b), 52(b), or 59], the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion.

¶ 22  In this instance, Synthes' motion to correct the record was not a motion made pursuant to any of these rules.  Therefore, it was not the type of motion which would have required Synthes to re-file its notice of appeal following the trial court's grant or denial.

## CONCLUSION

¶ 23  We have jurisdiction of this appeal. Fitz failed to present evidence that Synthes had breached an implied warranty of fitness for purpose.  Specifically, he failed to present medical evidence that the Synthes screw breakage proximately caused his fusion to fail.  Therefore, the trial court erred by denying Synthes' motions for directed verdict and JNOV and by allowing the case to go to the jury.  Accordingly, we reverse the trial court's denial of these motions and remand this case with instructions to enter a judgment notwithstanding the verdict in favor of Synthes.

¶ 24  Associate Chief Justice DURHAM, Justice ZIMMERMAN, Justice RUSSON, and Judge BURNINGHAM concur in Chief Justice HOWE'S opinion.

¶ 25  Having disqualified himself, Justice STEWART does not participate herein; District Judge GUY R. BURNINGHAM sat.